UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MARTIN SOUDANI and EMAN SOUDANI,

                                       Civil Action No.: 7:25-cv-04320

         Plaintiffs,                **<u>COMPLAINT</u>**

           vs.                    **JURY TRIAL DEMANDED**

COUNTY OF ORANGE,
THE ORANGE COUNTY
DISTRICT ATTORNEY'S OFFICE,
DAVID HOOVLER,
CHRISTOPHER BOREK, and
John Doe, as Administrator
of the Estate of
STEWART ROSENWASSER, in their
individual and official capacities,

         Defendants.
----------------------------------------------------------x

       Plaintiffs Eman Soudani and Martin Soudani, by and through their undersigned

counsel, respectfully state and allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.       In April 1940, Robert H. Jackson, then the Attorney General of the United

States, and later a United States Supreme Court justice, said:

> The prosecutor has more control over life, liberty, and reputation than any
> other person in America. His discretion is tremendous ... While the prosecutor
> at his best is one of the most beneficent forces in our society, when he acts
> from malice or other base motives, he is one of the worst.[1]

2.       As the 2021 Annual Report of the Orange County District Attorney's Office

("OCDA") states: "Public service is a sacred trust and those who abuse their positions to

---

[1] Jackson, R.H., April 1, 1940, *The Federal Prosecutor*, Speech delivered at the Second Annual Conference of United States Attorneys (https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf, last accessed on May 13, 2025). The quote echoes David Hume: "The corruption of the best things gives rise to the worst." Hume, David, "The Natural History of Religion." Four Dissertations, London: A. Millar, 1757.

enrich themselves must be held accountable."[2]

3.      This case involves a blatant example of prosecutorial misconduct and the administrative and supervisory failures that allowed it to occur. Those responsible must be held accountable. The misconduct is sufficient to shake the public's confidence in the judicial system and the foundational legal institutions on which we rely for protection.

4.      Stewart Rosenwasser was Chief Counsel and Executive Assistant District Attorney ("EADA") to Orange County District Attorney David Hoovler in the OCDA.[3] Rosenwasser was a high-level county policymaker and a senior supervisor and decision-maker within the OCDA.

5.      From November 2022 to January 2024, EADA Rosenwasser took at least $58,000 in a series of bribes from Mout'z Soudani.[4] In exchange, EADA Rosenwasser exploited the OCDA's lax controls and prosecutorial powers to investigate and bring felony charges against Eman and Martin Soudani. He took many of the bribe payments near in time to his achievement of significant milestones in the criminal cases against Eman and Martin Soudani.

6.      Mout'z Soudani falsely claimed that Eman and Martin Soudani stole money from him. Absent his allegations, the OCDA lacked any basis to investigate Eman and Martin Soudani, search their property, or to arrest, detain, and prosecute them.

---

[2] https://www.orangecountygov.com/DocumentCenter/View/24170/2021-OCDA-Annual-Report?bidId= at 31.

[3] Rosenwasser died by suicide in September 2024 when law enforcement agents tried to arrest him in connection with a federal indictment charging him with the bribery scheme outlined in this Complaint. *United States v. Stewart Rosenwasser and Mout'z Soudani*, Case No. 7:24-CR-00555, ECF No. 2 (S.D.N.Y) (the "federal indictment"). The lawsuit is brought, as the law requires, against Rosenwasser's estate and its administrator, but the gravamen of the misconduct is that committed by Rosenwasser in his individual and official capacities and references to "EADA Rosenwasser" or "Defendant Rosenwasser" should be viewed in that light.

[4] On information and belief, the source of which is the federal indictment, the total amount of bribes Rosenwasser solicited and received was at least $63,000.

7.     Mout'z Soudani sought Eman and Martin Soudani's prosecution because, as he texted EADA Rosenwasser, he wanted to see them "humiliated."[5] Mout'z Soudani wanted to punish and shame them because, in October 2022, they fled to Colorado from the Orange County residence they shared with him to escape his long-term abuse.[6]

8.     Eman Soudani is Mout'z Soudani's sister. Mout'z Soudani subjected her to more than 45 years of sexual, physical, and psychological abuse. He raped Eman Soudani just days prior to her departure for Colorado.[7]

9.     Martin Soudani is Eman Soudani's son and Mout'z Soudani's nephew. Mout'z Soudani physically and psychologically abused Martin Soudani both when Martin Soudani was a child and as an adult.

10.     Enraged by their flight from his home, Mout'z Soudani contacted his longtime friend and former private attorney EADA Rosenwasser within days of their departure. Not long afterwards, Rosenwasser agreed to exploit his high managerial position within the OCDA to prosecute Eman and Martin Soudani in exchange for money.

11.     EADA Rosenwasser betrayed his oath to support the constitutions of the United States and the State of New York and acted with the malicious intent to harm Eman and Martin Soudani and to deprive them of their constitutional rights. His solicitation of bribes to employ the OCDA's power and authority intertwined his exercise of prosecutorial discretion with other, unauthorized conduct, and thus forfeited any immunity he might otherwise have possessed.[8]

---

[5] On March 7, 2023, Mout'z Soudani texted EADA Rosenwasser that "I wish you will have some recordings for the arrest I want to see [Eman and Martin Soudani] humiliated specially him."

[6] Mout'z Soudani is not named in this lawsuit. Eman and Martin Soudani entered into a civil settlement agreement with Mout'z Soudani.

[7] In November 2023, under the New York Adult Survivors Act, Eman Soudani sued Mout'z Soudani seeking damages, among other things, for the years of sexual abuse to which he subjected her. *Soudani v. Soudani,* 7-23-cv-09905 (PMH) (S.D.N.Y.).

[8] *See Anilao v. Spota,* 27 F.4th 855, 864-65, fn. 5 (2d Cir. 2022) ("If the laws authorize prosecution for the

12.     In return for the bribes Mout'z Soudani paid, EADA Rosenwasser, among

other things:

      a.  used his high managerial position, supervisory power, and
         decision-making authority within the OCDA to marshal its
         powers to investigate and prosecute Eman and Martin Soudani;

      b.  supervised and participated in the pre-arrest investigation of
         Eman and Martin Soudani, the execution of search warrants, and
         the arrests of Eman and Martin Soudani;

      c.  defrauded New York and Colorado courts by failing to disclose
         that Mout'z Soudani paid him bribes to investigate and bring
         cases against Eman and Martin Soudani;

      d.  caused the March 8, 2023 arrest, detainment, and incarceration
         of Eman and Martin Soudani;

      e.  presented evidence to a grand jury against Martin Soudani
         without disclosing that Mout'z Soudani bribed him;

      f.  improperly provided Mout'z Soudani confidential information
         about the OCDA's investigation and prosecution of Eman and
         Martin Soudani; and

      g.  failed to disclose exculpatory and other information he was
         required to provide Eman and Martin Soudani, including but not

---

charged crimes, a prosecutor may still be liable if he 'has intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct.' *Bernard v. County of Suffolk*, 356 F.3d 495, 504 [2d Cir. 2004]. Cited examples in which officials act clearly outside the scope of their powers include charging decisions that are accompanied by unauthorized demands for a bribe, sexual favors, the defendant's performance of a religious act, or the like. *See id*. Presumably <u>no</u> statute would authorize those acts under any circumstances." [emphasis in original]).

limited to information about the bribes.

13.     Immediately after Eman and Martin Soudani were arrested, their defense attorneys ("the defense") informed the OCDA that EADA Rosenwasser should be recused from the cases being brought against them because of Rosenwasser's prior professional and ongoing personal relationship with Mout'z Soudani and the Soudani family.

14.     In response, EADA Rosenwasser lied to the defense and to DA Hoovler and Chief ADA Borek, claiming not to recall representing Mout'z Soudani as a private attorney, that he "would not even describe [his] relationship with the Soudani family as social," and, on information and belief, the source of which is the federal indictment, that he knew Mout'z Soudani only because he sometimes bought coffee and bagels from him.

15.     DA Hoovler and Chief ADA Borek cannot escape liability by hiding behind EADA Rosenwasser's attempted deceptions. They knew or should have known that EADA Rosenwasser was lying.

16.     Among other evidence that EADA Rosenwasser lied about his relationship with Mout'z Soudani, DA Hoovler and Chief ADA Borek possessed text messages and videotaped evidence that made obvious their close connection, and an FBI agent told Borek that Mout'z Soudani admitted making a prior unrepaid loan to Rosenwasser.[9]

17.     DA Hoovler and Chief ADA Borek also saw EADA Rosenwasser's strange behavior during the OCDA's investigation and prosecution of Eman and Martin Soudani, which itself should have compelled them to scrutinize Rosenwasser's relationship with Mout'z Soudani.

18.     EADA Rosenwasser's unusual behavior included his summary rejection of

---

[9] The same FBI agent told Borek that Mout'z Soudani was a suspect in an active murder investigation in another county.

Eman Soudani's rape allegations against Mout'z Soudani and his failure to act on Mout'z Soudani's written extortionate and violent threats against Eman and Martin Soudani.

19.    The threats – made after Eman Soudani reported Mout'z Soudani's sexual abuse to the OCDA and EADA Rosenwasser – included: "the more [Eman Soudani] fights me and opens her big mouth, the more I will be punishing her son like you have never seen before."[10] In another written threat, Mout'z Soudani told Eman Soudani:

> You and your son a psychopath playing the victim. I'm the one who kept you guys floatin and covert all your mistakes. You are not smart you are a fucking idiot your son smart with somethings petty. Also a fucking dumb idiot you know different from your sisters you're worse than all of them Mrs. Ivana Trump **swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before … you're a fucking hypocrite, liar hypocrite, vicious mean sneaky fuck I swear to God, the more you fuck with me, the more I will destroy your son completely I fucking hate you.** (emphasis added).[11]

20.    These threats, as her defense told the OCDA, put Eman Soudani in fear for her life. DA Hoovler, Chief ADA Borek and EADA Rosenwasser refused to investigate or prosecute Mout'z Soudani for the crimes he committed by making them. They also refused to consider that the threats undermined Mout'z Soudani's credibility as a witness. That these threats later supported federal criminal charges against Mout'z Soudani demonstrates Hoovler and Borek's failure to manage and supervise the OCDA and Rosenwasser.[12]

21.    DA Hoovler and Chief ADA Borek failed in their administrative capacities. They neglected to implement, disregarded, and/or violated policies and procedures to

---

[10] In the same letter, Mout'z Soudani tried to extort Eman Soudani: "all [she] has to do is give me $150,000 cash, give me back the car, and give me Rascal [a dog]. I would then be done with [Eman and Martin Soudani] forever… It would be as if nothing ever happened." Soudani bragged, referring to Rosenwasser, "[a]lso, you should know, the bus stops here at the DA's office. Nothing will happen unless he wants it to happen."

[11] All quotations from text messages and letters retain original typographical and other textual errors.

[12] *United States v. Rosenwasser et. al*, Case No. 7:24-CR-00555, ECF Entry No. 2 (S.D.N.Y) (Count 8, Charging Mout'z Soudani with Interstate Threats for a message sent on April 16, 2023).

identify and react to staff conflicts of interest. But for Hoovler and Borek's negligence and arrogant disregard of their own policies, EADA Rosenwasser and Mout'z Soudani's bribery scheme would have been exposed. A subpoena for Mout'z Soudani's bank records would have revealed the bribe checks, and a simple review of Rosenwasser's texts would have uncovered his lies and misconduct. Hoovler and Borek could not be bothered. They turned a willful blind eye and Hoovler presented Rosenwasser with awards. Hoovler and Borek's malicious dereliction of their managerial duties and their slipshod stewardship of the OCDA caused the deprivation of Eman and Martin Soudani's constitutional rights.

22.     DA Hoovler failed to practice what he preached about conflicts of interest. On or about January 30, 2023, Hoovler issued a press release suggesting that "all local governmental officials institute practices and procedures to ensure that neither they, nor those who work under them, engage in any prohibited conflict of interest."[13]

23.     Ironically, days before DA Hoovler issued the statement, the OCDA obtained text messages that exposed EADA Rosenwasser and Mout'z Soudani's conflicted and corrupt relationship. If Hoovler took his own advice, Rosenwasser's lies and the truth about his corrupt relationship with Mout'z Soudani would have been revealed.

24.     DA Hoovler and Chief ADA Borek knew that EADA Rosenwasser violated the OCDA's prohibition on OCDA staff using their personal phones for case-related texts, and they violated the same policy themselves by not reviewing and disclosing the texts between Rosenwasser and Mout'z Soudani to the defense. Hoovler, evidencing a willful and self-serving pattern of flaunting OCDA policies and procedures, also violated the policy by using his personal email to send and receive case-related communications in an

---

[13] *District Attorney Hoovler Reminds Local Officials to Avoid Conflicts of Interests,* Orange County News (Jan. 30, 2023), https://www.orangecountygov.com/CivicAlerts.aspx?AID=1708&ARC=2855.

unrelated matter in which he was personally implicated in a conflict of interest-related scandal.

25.    Eman Soudani, a woman whose brother raped and abused her during her entire adult life, was denigrated and devalued by DA Hoovler's office. She was wrongfully investigated, arrested, jailed, and charged with a class "C" felony that exposed to her a sentence of 15 years in jail, and threatened with additional charges. She was required to watch as her son was wrongfully arrested, prosecuted, and incarcerated for over 16 months. As an additional indignity, she endured Chief ADA Borek turning a tin ear when, for the first time, she gathered the courage to tell someone in authority about her abuse.

26.    Martin Soudani, Eman Soudani's son, grew up in Mout'z Soudani's violent household, observed Mout'z Soudani's physical and psychological abuse of his mother, and suffered Mout'z Soudani's abuse as a child and an adult. He was investigated, arrested, and indicted for a class "B" felony. He was jailed for over 16 months and eventually pleaded guilty – but not because he stole money. He was coerced into pleading guilty because the OCDA ignored EADA Rosenwasser and Mout'z Soudani's corrupt relationship, threatened his mother with further prosecution, and sought to jail him for up to twenty-five years if he refused to submit to its power.

27.    By August 2024, civil attorneys (working without the OCDA's law enforcement powers) uncovered evidence of EADA Rosenwasser and Mout'z Soudani's bribery scheme via a simple bank subpoena. In a motion detailing the bribery scheme, Martin Soudani asked the Court to vacate his conviction and to dismiss the indictment pursuant to New York Criminal Procedure Law § 440.10 (the "440.10 Motion") on the grounds that his conviction was procured by duress, misrepresentation, and fraud and was obtained in violation of his federal and state constitutional rights.

28.     On September 6, 2024, the day its response to the 440.10 Motion was due, the OCDA finally asked to be recused and for the Court to appoint another district attorney's office as a special prosecutor to respond to the 440.10 Motion. The Court appointed the Rockland County District Attorney's Office (the "RCDA").

29.     On or about September 11, 2024, Rosenwasser was sued for failing to repay $360,000 of a $450,000 bank loan issued to his law firm in April 2018, about a year before DA Hoovler hired him.

30.     On September 24, 2024, federal prosecutors in the Southern District of New York unsealed an indictment charging Rosenwasser and Mout'z Soudani in connection with the bribery scheme (the "federal indictment").[14]

31.     On September 24, 2024, Rosenwasser died by suicide when federal authorities tried to arrest him at his home. The federal prosecution against Mout'z Soudani is pending in the United Stated District Court for the Southern District of New York.[15]

32.     On October 4, 2024, the RCDA consented to vacatur of Martin Soudani's conviction and dismissal of the indictment, citing "extreme misconduct" and "a dark picture of prosecutorial misconduct, abuse of discretion, and the abandonment of all ethical standards held sacred by prosecutors."

33.     On October 15, 2024, the Orange County Supreme Court (Kim, J.) granted the 440.10 Motion without a hearing, finding that the "entire proceeding that yielded the indictment can be nothing less than tainted."

---

[14] Rosenwasser and Soudani were charged with bribery, conspiracy to commit bribery, extortion under color of official right, conspiracy to commit honest services fraud, and honest services wire fraud. Rosenwasser was also charged with making false statements. Soudani was also charged with making interstate threats.
[15] *United States v. Stewart Rosenwasser and Mout'z Soudani*, Case No. 7:24-CR-00555 (S.D.N.Y.).

## JURISDICTION AND VENUE

34.    This action arises under 42 U.S.C. §§ 1983 and 1988, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and the common law of the State of New York.

35.    This Court has jurisdiction over the causes of action asserted here pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interests and costs and there is complete diversity of citizenship between Plaintiffs, domiciled and resident in the State of Colorado, and Defendants, who are domiciled and resident in the State of New York.

36.    This Court also has jurisdiction of federal claims arising out of 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Eman and Martin Soudani's state law claims pursuant to 28 U.S.C. § 136.

37.    On or about August 23, 2024, Eman and Martin Soudani served Orange County timely notice of the present claim, in accordance with N.Y. Gen. Mun. Law § 50-e. On November 6, 2024, a hearing pursuant to Mun. Law § 50-h was held as to Eman Soudani. On November 7, 2024, a hearing pursuant to Mun. Law § 50-h was held as to Martin Soudani.

38.    More than 90 days have elapsed since submission of Eman and Martin Soudani's notices of claim and their 50-h hearings, more than 30 days have elapsed since the conclusion of each of their 50-h hearings, and Defendant Orange County has not attempted to settle the instant claims.

39.    Eman and Martin Soudani have complied with all the conditions precedent to the commencement of this action.

40.    Venue is proper pursuant to 28 U.S.C. § 1391(b) in that all or a substantial part of the events or omissions forming the basis of these claims occurred in

Orange County, New York, which is within the Southern District of New York.

## PARTIES

41.    Plaintiff Eman Soudani is a resident and domiciliary of Arapahoe County, Colorado. From 1977 until October 2022, Eman Soudani was a resident and domiciliary of New York, living in Rockland County and then Orange County – most of that time in the same house as her brother, Mout'z Soudani. In October 2022, Eman Soudani left New York and moved to Colorado to escape Mout'z Soudani's long-term sexual, physical, and psychological abuse.

42.    Plaintiff Martin Soudani is a resident and domiciliary of Arapahoe County, Colorado. Martin Soudani is Eman Soudani's son and resided with Eman and Mout'z Soudani in Mout'z Soudani's house for most of his life. He also was subject to abuse at the hand of Mout'z Soudani, both as a child and an adult. In October 2022, Martin Soudani left New York with Eman Soudani for Colorado.

43.    Defendant Orange County is a county in New York State.

44.    Defendant OCDA is one of 62 District Attorney's Offices in New York State. The Orange County District Attorney is an independently elected official, with powers and duties outlined in the New York County Law.

45.    At all relevant times during the OCDA's investigation and prosecution of Eman and Martin Soudani, Defendant David Hoovler, a resident of Orange County, New York, was the elected District Attorney of Orange County, a position he has held since January 1, 2014. As a county policymaker and final decision maker, at all relevant times he was acting within the scope of his authority and under color of New York State law, unless otherwise specified. He is named in his individual and official capacities.

   a.  DA Hoovler has broad discretion to determine whether and how

11

to prosecute criminal cases. Hoovler can, and does, delegate the final decision to prosecute individuals to senior staff, including the Chief ADA and the EADAs.

b. Hoovler, in making decisions other than whether to prosecute, acts as the manager of the OCDA and is a municipal policymaker. As a delegate of Orange County and the municipal policymaker, Hoovler has general supervisory duties to administer and comply with existing federal, state, and local laws and regulations and to establish policies, procedures, and practices for the OCDA. Hoovler can, and does, delegate final decisions over managerial matters to senior staff, including the Chief ADA and the EADAs.

c. To fulfill his responsibility as District Attorney, Hoovler appoints assistant district attorneys, who prosecute cases pursuant to the law and office policy.

d. According to reports, the OCDA handles 20,000 cases a year with 45 assistant district attorneys, 12 investigators, and about 19 clerical staff.[16]

e. Hoovler appointed at least three EADAs, including EADA Rosenwasser. EADAs are senior OCDA supervisors, can manage money for the OCDA, and are authorized to serve as the District Attorney in DA Hoovler's absence.

46.    In February 2008, Hoovler began working as a lawyer at the law firm Ostrer

---

[16] *About the Office*, OCDA, https://www.orangecountygov.com/265/About-the-Office (last visited May 19, 2025).

Rosenwasser LLP, of which Rosenwasser was a partner. Hoovler worked in private legal practice until January 2014, when he was sworn in as District Attorney.

47.     At all relevant times during the OCDA's investigation and prosecution of Eman and Martin Soudani, Defendant Christoper Borek, a resident of Orange County, New York, was the Chief Assistant District Attorney in the OCDA, a county policymaker and decision maker, and was acting within the scope of his authority and under color of New York State law, unless otherwise specified. Borek is named in his individual and official capacities. Borek is a senior OCDA supervisor, can manage money on the OCDA's behalf, and is authorized to act with the District Attorney's authority in DA Hoovler's absence. As a delegate of Orange County and Hoovler, Borek had general supervisory duties to administer and comply with existing federal and state laws and regulations and to establish policies, procedures, and practices for the OCDA.

48.     At all relevant times during the OCDA's investigation and prosecution of Eman and Martin Soudani, EADA Stewart Rosenwasser, until his death in September 2024, was a resident of Orange County, New York. Rosenwasser was a county policymaker and decision maker acting within the scope of his authority and under color of New York State law, unless otherwise specified. He is named in his individual and official capacities.

    a.  Rosenwasser served as an Assistant District Attorney at the OCDA and as an attorney in private practice for over 20 years prior to being elected a judge in the Orange County Court in the Ninth Judicial District in 1999. He also served as an Acting New York State Supreme Court Justice.

    b.  In 1990, as a private attorney, Rosenwasser defended Mout'z Soudani on an indicted burglary case prosecuted by the OCDA.

c.  As a private attorney, Rosenwasser represented Mout'z Soudani and Eman Soudani on at least ten separate real estate transactions in the 1990s.

d.  On information and belief, the source of which is a report by an FBI agent to Chief ADA Borek, Rosenwasser, as a judge, took a $40,000 "loan" from Mout'z Soudani that he never repaid.

e.  Rosenwasser retired from the bench in 2006 and returned to private practice, forming the law firm Ostrer Rosenwasser LLP.

f.  As a private attorney, Rosenwasser served as a Referee for the New York State Commission on Judicial Conduct and as a Special Referee for the New York State Grievance Committee for the Ninth Judicial District.

g.  As a private attorney in April 2018, Rosenwasser personally guaranteed a $450,000 loan taken from Walden Savings Bank by his law firm, Rosenwasser Law, P.C. As of June 2019, the loan was not repaid.

h.  On or about June 19, 2019, Hoovler hired Rosenwasser at the OCDA as Special Counsel for Policy, Research and Legal Development. Rosenwasser was also Chief Counsel to the District Attorney. On hiring Rosenwasser, Hoovler announced:

> Stewart Rosenwasser's experience as a Judge and Special Referee will be invaluable to the Office in our quest to ensure no one is wrongfully convicted and that our Office lives up to the highest ethical standards for prosecutors. The public good is surely advanced when a lawyer of Judge Rosenwasser's caliber and ethical standards agrees to continue in

public service.[17]

i.  According to reports, certain OCDA personnel knew about allegations that as a judge Rosenwasser solicited bribes in return for favorable dispositions when Hoovler hired Rosenwasser.[18]

j.  In 2022, Hoovler sought and obtained authority from the Orange County Legislature to promote Rosenwasser to EADA.

k.  On or about April 12, 2022, Hoovler promoted Rosenwasser to EADA.

l.  As a delegate of Orange County and Hoovler in Hoovler's capacity as a municipal policymaker, Rosenwasser had general supervisory duties to administer and comply with existing federal, state and local laws and regulations, and to establish OCDA policies procedures, and practices.

m.  As an EADA, Rosenwasser was a high-level OCDA manager and decision maker, empowered to act with the power of the District Attorney in the District Attorney's absence, and to manage money for the OCDA.

n.  On information and belief, as part of his high-level managerial duties within the OCDA, EADA Rosenwasser reviewed all potential grand jury cases to determine their appropriateness for

---

[17] *DA Hoovler Announces Hiring of Former Judge Stewart A. Rosenwasser as Special Counsel for Policy, Research and Legal Development*, davidmhoovler.com (last visited May 19, 2025), https://davidmhoovler.com/da-hoovler-announces-hiring-of-former-judge-stewart-a-rosenwasser-as-special-counsel-for-policy-research-and-legal-development/.

[18] Walsh, J., *The Good Ol' Boys of Montgomery*, Intelligencer (Jan. 22, 2025), https://nymag.com/intelligencer/article/stewart-rosenwasser-moutz-soudani-eman-soudani-montgomery-ny.html.

presentation to a grand jury.

o.  Given his high-level policymaking role and supervisorial position in the OCDA, from 2019 through 2024 EADA Rosenwasser reportedly handled only three cases in addition to the cases against Eman and Martin Soudani.

49.    Defendant John Doe is the Administrator of the Estate of Stewart Rosenwasser, now deceased, and is named in that capacity.[19]

## FACTUAL ALLEGATIONS

50.    In 1977, Eman Soudani moved to the U.S. from Jordan. She was 17 years old. Except for a brief period when she was married, Eman Soudani lived with her brother Mout'z Soudani until October 2022.

51.    During that entire period, including when she was married, Mout'z Soudani subjected Eman Soudani to sexual, physical, and psychological abuse.

52.    Mout'z Soudani also subjected other Soudani family members, including Martin Soudani, to abuse.

53.    Eman Soudani did not report Mout'z Soudani's abuse to anyone, among other reasons, because she thought that no one would believe her due to Mout'z Soudani's power and influence in the community.

54.    In or about mid-October 2022, Eman and Martin Soudani left their shared residence with Mout'z Soudani to move to Colorado. They did so to escape Mout'z Soudani's abuse, domination, and control.

55.    Days prior to their departure, Mout'z Soudani raped Eman Soudani.

---

[19] Plaintiffs have instituted a proceeding in the Orange County Surrogate's Court requesting the appointment of an administrator of the Rosenwasser estate. *Estate of Stewart Rosenwasser,* File Nos. 2024-981/A and B (Orange Cty. Surrogates Court).

56.    Mout'z Soudani was enraged when Eman and Martin Soudani escaped his domination and control and sought revenge.

57.    On or about October 16, 2022, Mout'z Soudani met with a friend, an FBI agent (the "FBI Agent"), and claimed that Eman and Martin Soudani stole money from him when they left for Colorado.[20] Mout'z Soudani also told the FBI Agent that years ago when EADA Rosenwasser was a judge, he had loaned Rosenwasser about $40,000 that Rosenwasser never repaid, and that Rosenwasser would "take care of" his situation.

**Pre-Search Warrant Investigation and Bribes Taken by Rosenwasser**

58.    On information and belief, the source of which is the federal indictment, between October 26, 2022 and November 3, 2022, EADA Rosenwasser and Mout'z Soudani exchanged multiple phone calls.

59.    On or about October 28, 2022, EADA Rosenwasser emailed Investigator Vincent Spampinato, a Peace Officer with the New York State Department of Financial Services ("DFS") regarding a "Potential Case," stating that Mout'z Soudani alleged that Eman and Martin Soudani "may have stolen an investment account (1.8 million) and over a half million dollars in cash."

60.    Investigator Spampinato took direction from and assisted EADA Rosenwasser throughout the OCDA's subsequent investigation and prosecution of Eman and Martin Soudani.

61.    On information and belief, EADA Rosenwasser never provided Investigator Spampinato or other DFS agents information that undermined Rosenwasser's and Mout'z Soudani's credibility and motive for investigating and prosecuting Eman and Martin

---

[20] The FBI Agent was also a friend of Eman Soudani.

Soudani, including that:

    a.  Mout'z Soudani was his long-time friend and former client;

    b.  Mout'z Soudani loaned him money that Rosenwasser never repaid;

    c.  Mout'z Soudani bribed Rosenwasser to investigate and prosecute Eman and Martin Soudani;

    d.  Mout'z Soudani wanted to humiliate Eman Soudani and Martin Soudani by having them arrested, detained, and prosecuted;

    e.  Rosenwasser agreed in text messages to "always protect" "and help" Mout'z Soudani;

    f.  Mout'z Soudani texted Rosenwasser that he had deleted "everything that was bad" on his phone just before Rosenwasser gave him transactional immunity in the grand jury.

62.    On or about November 6, 2022, Mout'z Soudani met with the FBI Agent, whom he told, "the DA's on my side . . . He's my friend . . . So that's at least in good hands."

63.    On or about November 7, 2022, Mout'z Soudani texted EADA Rosenwasser to request Eman and Martin Soudani's Colorado address. Rosenwasser complied.





64.    On information and belief, EADA Rosenwasser used his personal mobile phone to exchange case-related and other text messages with Mout'z Soudani.

65.    The OCDA maintained a written policy that "strictly prohibited" staff from using personal electronic devices to communicate about cases (the "OCDA email and text messaging policy"). Senior OCDA leadership, including DA Hoovler, endorsed the policy and Chief ADA Borek distributed it to OCDA staff in January 2014.

66.    On or about November 10, 2022, EADA Rosenwasser and Mout'z Soudani arranged via text to meet at about 1:00 p.m. at a restaurant. Less than two hours after they met, at about 2:46 p.m., Mout'z Soudani texted Rosenwasser that "[t]he thing is ready in the mailbox."



67.    Mout'z Soudani wrote a check for $15,000 to EADA Rosenwasser dated November 10, 2022, with the word "Loan" written on the memo line.

68.    On or about November 10, 2022, at 4:07 pm., less than 90 minutes after Mout'z Soudani texted EADA Rosenwasser that the "thing" was in the mailbox,

19

Rosenwasser deposited the check in his bank account.



**Rosenwasser Misuses the Grand Jury Process**

69.     On or about November 14, 2022, the next business day following the check deposit, EADA Rosenwasser began a perverted use of grand jury process by issuing the first of at least 15 grand jury subpoenas demanding the production of evidence.

70.     On information and belief, Rosenwasser was the final decision-maker regarding opening the investigation and issuance of subpoenas; no one at the OCDA supervised, approved, or reviewed that decision.

71.     The initial November 14, 2022 subpoena was addressed to Coinbase, Inc. It demanded records relating to Eman, Martin, or Mout'z Soudani. The subpoena identified no individual grand jury matter other than a defendant named "John Doe." Upon information and belief, no grand jury was empaneled to hear evidence in connection with the matter. The subpoena allowed Coinbase to bypass the grand jury and submit records directly to EADA Rosenwasser.

72.     EADA Rosenwasser misused grand jury process for several months, through at least March 31, 2023, seeking records that included the private financial records of Eman and Martin Soudani. All the subpoenas authorized the recipients to bypass the grand jury. Most of the subpoenas identified the grand jury matter as being against a defendant named "John Doe." Beginning in March 2023, the issued subpoenas identified

the grand jury matter as being against Martin Soudani or Eman Soudani. None of the subpoenas included an identifying number or otherwise set forth a particular investigation that was, in fact, pending before a grand jury.

73.    EADA Rosenwasser used grand jury process as if he were issuing office subpoenas, an authority he lacked because he solicited bribes from and was acting out of greed and malice to satisfy Mout'z Soudani.

**The Christmas Bribe; Rosenwasser Instructs Soudani to Stop Texting**

74.    On December 20, 2022, Mout'z Soudani texted EADA Rosenwasser that he (Rosenwasser) was "the perfect man for the job" and that he (Soudani) was "going to remember that."



75.    On December 23, 2022, EADA Rosenwasser texted Mout'z Soudani that he (Rosenwasser) would go to Colorado for the search warrant execution. Rosenwasser bragged about leveraging his relationship with Eman Soudani: "I think when Eman sees me, it's over." Mout'z Soudani responded, "You are 100% right and I give my word at the end you will be extremely more than happy god bless you you the only man who could do this" and "please I have to meet with you whenever you say for five minutes before you leave to Colorado thanks."



76.     On or about December 25, 2022, Mout'z Soudani wrote a check for $5,000 to EADA Rosenwasser with the word "Loan" written on the memo line.



77.     On December 26, 2022, a New York public holiday, Mout'z Soudani and EADA Rosenwasser arranged by text to meet in person at Mout'z Soudani's home.



78.    On or about December 28, 2022, EADA Rosenwasser deposited the $5,000 check in his bank account.

79.    On January 9, 2023, EADA Rosenwasser texted that "I won't text anymore" and "Anything you want to tell me, call. That's it."



**OCDA Obtains Electronic Evidence of Rosenwasser's Relationship with Soudani; Soudani Instructs Rosenwasser to "Complicate" Eman Soudani to Influence Martin Soudani**

80.     On or about January 19, 2023, Mout'z Soudani met with an investigator at the OCDA's offices to make a forensic image of his cell phone. As a result, the OCDA recovered at least 76 texts exchanged by EADA Rosenwasser and Mout'z Soudani between December 23, 2022 to January 19, 2023.[21]

81.     The texts the OCDA recovered included, but were not limited to, EADA Rosenwasser and Mout'z Soudani's discussion about meeting at Mout'z Soudani's home the day after Christmas, Rosenwasser's prediction that he could leverage his relationship with Eman Soudani ("I think when Eman sees me, it's over"), and Mout'z Soudani's reply, "I give my word when this is over you will be extremely more than happy."

82.     Based on the recovered 76 texts alone, DA Hoovler and Chief ADA Borek knew or should have known that EADA Rosenwasser violated the OCDA email and text messaging policy and lied about his relationship with Mout'z Soudani.

83.     On information and belief, the source of which is the federal indictment, in November and December 2022 alone Mout'z Soudani and EADA Rosenwasser exchanged at least 200 text messages and 26 phone calls.

84.     On January 20, 2023, the day after the OCDA imaged Mout'z Soudani's phone, Mout'z Soudani texted EADA Rosenwasser that he knew Rosenwasser was "protecting" him and wanted no "harm to come to" him. Mout'z Soudani said he knew

---

[21] Plaintiffs do not know the search parameters the OCDA used for imaging Soudani's phone or how many text messages the OCDA recovered from it. Although the OCDA eventually produced 76 text messages between Rosenwasser and Soudani to the defense for Eman and Martin Soudani, including those referenced in ¶ 81, it is unknown whether the OCDA recovered additional, unproduced texts. In any event, Mout'z Soudani's imaged phone (and EADA Rosenwasser's phone) contained hundreds of texts that should have been recovered and produced.

Rosenwasser for 40 years, that he had "nothing but love ♥" for Rosenwasser, that Rosenwasser was "impressing the hell" out of him, and that "loyalty to both of us comes before religion." In reply, Rosenwasser thanked Mout'z Soudani and assured him that "I will always protect you." "And help you."



85.     On January 23, 2023, Mout'z Soudani made a sworn written statement to Investigator Spampinato. He claimed that he never permitted Martin Soudani to invest in cryptocurrency, that he would "never take that kind of risk or allow anyone to take that risk on my behalf," that Eman Soudani stole more than $550,000 in cash, and that when he tried to report the thefts to a local police department, they told him it was a civil matter.

86.     On January 23, 2023, Mout'z Soudani texted EADA Rosenwasser case-related information, including details about Martin Soudani's bank accounts. Mout'z

Soudani also texted that "the charges has to scare the shit out of [Martin Soudani]" and "**you have to complicate his mother** so he will know it's not only him but his mother (emphasis added)." Rosenwasser responded "I will call you tomorrow. We must stop creating test [sic] messages. Period.



### Hoovler Reminds Public Officials to Avoid Conflicts of Interest

87.     On or about January 30, 2023, DA Hoovler issued a statement urging other public officials to "abide by the New York General Municipal Law by disclosing and avoiding any situation where they, or their family members, benefit from their governmental positions." Per Hoovler, "Residents are entitled to honest government," "[t]hose who work in a public capacity should be doing so for the benefit of all, not to help themselves or their family members," and "[t]axpayers deserve nothing less." DA Hoovler further advised that "all local governmental officials institute practices and procedures to ensure that neither they, nor those who work under them, engage in any prohibited conflict of interest."[22]

---

[22] *District Attorney Hoovler Reminds Local Officials to Avoid Conflicts of Interests,* Orange County News (Jan. 30, 2023), https://www.orangecountygov.com/CivicAlerts.aspx?AID=1708&ARC=2855.

**Rosenwasser Takes Another Bribe Check; Seeks Search Warrants in Colorado and Obtains Authorization from Hoovler for Himself and OCDA Agents to Travel to Colorado**

88.    On February 9, 2023, EADA Rosenwasser texted Mout'z Soudani that he was "almost ready to go to grand jury." Mout'z Soudani responded "I thought [so] that is why iam leaving you alone you are usually ahead of me . . . . God bless you."

89.    On February 9, 2023, EADA Rosenwasser emailed Investigator Spampinato about traveling to Colorado. The email indicates that DA Hoovler knew about and authorized Rosenwasser's travel to Colorado to take part in the arrests.

> On Feb 9, 2023, at 2:12 PM, Rosenwasser, Stewart
> <SRosenwasser@orangecountygov.com> wrote:
>
> I'm going to have to get the timing right. Dave wants me to book flights at least 2 weeks in advance. I want to give Sgt. Schuster 2 weeks on the warrant, and I have to get the proof in the GJ so I can vote it out when I get back. We'll arrest him and file a complaint after we talk to him, while we are out there.

90.    On or about February 13, 2023, Mout'z Soudani issued a $5,000 check with the word "Loan" written on the memo line to EADA Rosenwasser that Rosenwasser deposited the same day.

 

CK #1070    PD 02/13    $5000.00

91.    On February 22, 2023, EADA Rosenwasser emailed a search warrant application to Chief ADA Borek.

92.    In or about February 2023, EADA Rosenwasser contacted Parker Colorado

Police Department Sergeant Jacob Schuster ("Sergeant Schuster").

93.    On or about February 23, 2023, EADA Rosenwasser told Sergeant Schuster, in substance, that Rosenwasser planned to present criminal charges to a grand jury against Eman and Martin Soudani, and that he wanted to have search warrants executed in Colorado related to the investigation.

94.    On or about February 24, 2023, EADA Rosenwasser executed multiple sworn affidavits affirming his role as a senior OCDA official acting within the scope of his duties and with the OCDA's power and authority (the "February 24 Affidavits").

95.    In the February 24 Affidavits, EADA Rosenwasser swore there was probable cause that Eman and Martin Soudani stole money from Mout'z Soudani, that Mout'z Soudani told Rosenwasser that Eman and Martin Soudani stole cash in October 2022, and that he was "informed by [Mout'z Soudani]" that Martin Soudani "attempted to convince [Mout'z Soudani] … that he should invest in crypto currency" and "[Mout'z Soudani] finally agreed."

96.    EADA Rosenwasser's sworn statement that Mout'z Soudani authorized Martin Soudani to make cryptocurrency investments contradicts Mout'z Soudani's January 23, 2023 sworn statement to Investigator Spampinato, wherein Mout'z Soudani claimed he would "never" allow anyone to invest in cryptocurrency on his behalf.

97.    EADA Rosenwasser omitted from the February 24 Affidavits that he took bribes from Mout'z Soudani. As a result, Rosenwasser defrauded Sergeant Schuster and ultimately the Colorado court.

98.    On EADA Rosenwasser's behalf, Sergeant Schuster applied for three judicial search warrants in Colorado: one to search a 2019 Volvo registered to Martin Soudani; one to search a condominium where Eman and Martin Soudani had been living

since October 2022; and one to search a hotel room in which Martin Soudani had stayed temporarily. Relying on EADA Rosenwasser's sworn word and apparent authority, Sergeant Schuster copied the substance of the February 24 Affidavits into his warrant applications and submitted the applications to a Colorado court.

99.    On or about March 6, 2023, Colorado Magistrate Brian P. Fields issued search warrants for the two premises and, on or about March 8, 2023, issued a search warrant for the vehicle. Magistrate Fields relied on Sergeant Schuster's affidavit, which, in turn, was based on the February 24 Affidavits.

**Rosenwasser Agrees to Give Soudani Body Cam Footage so Soudani Can See Eman and Martin Soudani "Humiliated;" Rosenwasser Travels to Colorado and Confronts Eman Soudani**

100.    On March 7, 2023, Mout'z Soudani texted EADA Rosenwasser that "**I wish you will have some recordings for the arrest I want to see [Eman and Martin Soudani] humiliated specially him**" (emphasis added). Mout'z Soudani stated further that he had prayed and lit a candle for Rosenwasser, and that his stomach was "full of butterflies." Rosenwasser responded: "You will be able to see body camera footage." Mout'z Soudani replied, "Yes please."



101. On March 8, 2023, at the OCDA and EADA Rosenwasser's direction, Colorado and New York-based police personnel executed the search warrants in Colorado.

102. On March 8, 2023, at the OCDA and EADA Rosenwasser's direction, Eman and Martin Soudani were arrested in Colorado.

103. On March 8, 2023, EADA Rosenwasser participated in the execution of the search warrants in Colorado and in the arrests of Eman and Martin Soudani.

104. During the arrests and search warrant execution, EADA Rosenwasser came face-to-face with Eman Soudani. The police body cam footage of their interaction makes clear that Rosenwasser and Eman Soudani were on a first name basis, that Eman Soudani had cooked meals for Rosenwasser, and that Rosenwasser remembered the food she prepared. For example, the following exchange was captured on a body cam:

> **Eman Soudani**: Really? Rosenwasser? Me? Shame on you. Why are you coming after me? …. Shame on you. I'm your friend. I made you food …
>
> **EADA Rosenwasser**: Tabouleh ….
>
> **Eman Soudani**: You know why I left? I was getting beat up every single day. You want the truth? …
>
> **EADA Rosenwasser**: Eman, you need to help yourself and calm down.
>
> **Eman Soudani**: After 45 years of abuse. Shame on you. Only one sided. Because everybody is bought. Shame on you…. It's nice to know people in high places. He always gets away with everything. Shame on you. Shame on all of you…and this is what I get.
>
> **EADA Rosenwasser**: I'm not too high.

105. Additional body cam footage captures Eman Soudani insisting to EADA Rosenwasser that Mout'z Soudani abused her for 45 years, and that she had "covered up" for Mout'z Soudani during that period.

106.    EADA Rosenwasser responded: "Well, we're not here to talk about that."

107.    The body cam footage further captures Eman Soudani's accusation, to EADA Rosenwasser, that he was "protecting" Mout'z Soudani:

> **Eman Soudani**: That's why you are protecting him, Rosenwasser.
>
> **EADA Rosenwasser**: I'm not protecting anybody. I don't work for him.
>
> **Eman Soudani**: Well, it looks like you do because you took his word for it.

108.    By then, EADA Rosenwasser had pocketed at least $25,000 in bribes and had promised to "always protect" "and help" Mout'z Soudani.

109.    The body cam footage also recorded Eman Soudani's accusation, to EADA Rosenwasser, that Rosenwasser knew that Mout'z Soudani paid bribes to avoid prosecution in prior cases where Mout'z Soudani had been arrested.

110.    The OCDA, including DA Hoovler and Chief ADA Borek, possessed the March 8, 2023 police body cam footage. Two New York-based OCDA agents and numerous Colorado police officers were present, appear in the body cam footage, and witnessed EADA Rosenwasser's interaction with Eman Soudani.

111.    On March 8, 2023, the OCDA and EADA Rosenwasser caused Eman Soudani to be arrested in Colorado. She spent eight days in a Colorado jail.

112.    On March 8, 2023, the OCDA and EADA Rosenwasser caused Martin Soudani to be arrested in Colorado. He was held in custody until July 3, 2024.

113.    On March 8, 2023, Investigator Spampinato conducted a videotaped interview with Martin Soudani in which Martin Soudani stated that Mout'z Soudani has "people like Stewart Rosenwasser … that do whatever he wants."

114.    The OCDA, including DA Hoovler and Chief ADA Borek, possessed the

March 8, 2023 videotaped interview with Martin Soudani.

115.    During the search warrant execution, writings made by Martin Soudani prior to his arrest were recovered. These writings suggested a corrupt relationship between EADA Rosenwasser and Mout'z Soudani.

116.    On information and belief, the source of which is the federal indictment, in or about March 2023, EADA Rosenwasser and Mout'z Soudani exchanged approximately 28 phone calls and 63 text messages. Rosenwasser's case-related texts violated the OCDA email and text messaging policy. These included Rosenwasser's updates on the status of the arrests, that Eman Soudani had requested an attorney, that "[Eman Soudani] is tough but [Martin Soudani] will brake her" (sic), and that "We'll talk on phone. Not crazy about texting." On or about March 10, 2023, Rosenwasser texted that, "I will come by this weekend for [a] full report."

117.    On information and belief, the source of which is the federal indictment, on March 8, 2023, Mout'z Soudani texted EADA Rosenwasser not to leave Colorado "before you get all the money you can otherwise it will be completely gone" and that "[i]f [Eman and Martin Soudani] have no money you cripple them from all sides."

**The OCDA is Informed of a Conflict of Interest Between Rosenwasser and Soudani, Eman Soudani is Arraigned; Rosenwasser Takes Another Bribe Payment**

118.    After their arrests, Eman and Martin Soudani filed written notices that they intended to testify before the Grand Jury, as was their right under New York Criminal Procedure Law § 190.50.

119.    In March and early April 2023, the defense informed EADA Rosenwasser that his relationship with Mout'z Soudani and the Soudani family created at a minimum an appearance of impropriety that necessitated his recusal from the matters. The defense also

told Rosenwasser, as early as March 23, 2023, that Mout'z Soudani subjected Eman Soudani and others to long-term sexual abuse and provided information that Mout'z Soudani had committed multiple other crimes.

120.    By letter dated April 5, 2023, the defense for Eman Soudani wrote to EADA Rosenwasser that:

> [w]ith deference to your long and distinguished record of public service, your relationship to this family creates at least the appearance of a conflict. The positions you are taking in this case [are] unusual. We respectfully submit this is a case where the [OCDA] should take the time to hear all sides before it marches to the grand jury, and take great care not to credit undeservedly the word of a man who appears to have committed multiple crimes over a long period of time – particularly with respect to the element of "permission and authority."[23]

121.    In the April 5, 2023 letter, the defense for Eman Soudani told EADA Rosenwasser that her seized phone contained threatening texts from Mout'z Soudani, and that it appeared Rosenwasser was withholding phone access to prevent Eman and Martin Soudani from offering the texts as evidence to the grand jury.

122.    In response, by email on April 6, 2023, EADA Rosenwasser represented that "as I indicated to you during our first phone conversation, I do not recall a single instance that I served as Moutz Soudani's personal attorney and **would not even describe my relationship with the Soudani family as social**" (emphasis added).

123.    On April 10, 2023, the defense for Eman Soudani wrote EADA Rosenwasser that Eman Soudani had expressed fears for her physical safety and requested that Eman Soudani meet with sex crimes prosecutors when she was in New York.

124.    On April 11, 2023, EADA Rosenwasser provided discovery to the defense

---

[23] The defense was then unaware that Rosenwasser already had taken bribes from Mout'z Soudani.

(the "April 2023 discovery production"). The discovery materials included video of Rosenwasser's search warrant encounter with Eman Soudani, the video of Martin Soudani's interview with Investigator Spampinato, and some of Mout'z Soudani's bank records. The bank records included a check Mout'z Soudani wrote to local politician Steve Brescia that bore the memo line annotation "loan."

125.    EADA Rosenwasser did not disclose any text messages between himself and Mout'z Soudani, including those the OCDA recovered from Mout'z Soudani's phone on January 19, 2023. Nor did he reveal that he was taking bribes.

126.    On April 12, 2023, Eman Soudani was arraigned on a felony complaint in Middletown City Court, in New York, charging her with third degree grand larceny in violation of NY Penal Law § 155.40(1), a class "C" felony, for which the maximum potential prison sentence is 5 to 15 years. The complaint alleged that she stole more than $350,000 in cash from safes located in the house she shared with Mout'z Soudani.

127.    On or about April 14, 2023, Mout'z Soudani wrote a $5,000 check to EADA Rosenwasser with the word "Loan" written in the memo line. Undeterred by defense allegations about his relationship with Mout'z Soudani, confident of his favored position, and knowing the OCDA's lax practices, EADA Rosenwasser deposited the check that day.



CK #1156    PD 04/14    $5000.00

**The Defense for Eman Soudani Continues to Warn the OCDA About Rosenwasser's Conflict and Mout'z Soudani's Credibility and Motivation**

128.    In an April 17, 2023 letter, the defense for Eman Soudani warned the OCDA it would be a "miscarriage of justice" if Mout'z Soudani were permitted to testify in the grand jury without waiving immunity (the "April 17 Letter"). The letter stated:

a.    Rosenwasser's handling of the case presented at least the appearance of impropriety;

b.    Rosenwasser should recuse and wall himself off from the case;

c.    public information showed that Rosenwasser represented Mout'z Soudani and Eman Soudani in at least ten separate civil legal matters when he was in private legal practice;

d.    public information showed that Rosenwasser filed at least 19 documents in those civil legal matters;

e.    as a private attorney, Rosenwasser represented Mout'z Soudani and his son in an indicted burglary case (prosecuted by the OCDA);[24]

f.    Rosenwasser visited the Soudani residence while Rosenwasser served as a judge;

g.    Eman Soudani was reluctant to speak to Rosenwasser about the sexual violence inflicted by Mout'z Soudani due to Rosenwasser's relationship with and bias in favor of Mout'z Soudani;

h.    Rosenwasser's insistence that Eman Soudani meet with him before she could speak to a sex crimes prosecutor was highly unusual;

i.    Rosenwasser's reaction to Eman Soudani's allegations of violence

---

[24] The April 17 Letter did not specify that the OCDA was the prosecuting agency. That information was publicly available and certainly available to the OCDA. The OCDA case number was 90-455.

inflicted by Mout'z Soudani suggested that law enforcement was denigrating or dismissing her report due to Rosenwasser's relationship with Mout'z Soudani;

j. Rosenwasser refused to provide access to Eman Soudani's seized phone, which contained evidence of Mout'z Soudani's violence and bias against Eman Soudani;

k. Rosenwasser's threat to instruct a grand jury to disregard Eman Soudani's potential testimony about the physical and sexual abuse she suffered from Mout'z Soudani was highly unusual;

l. Mout'z Soudani's various inconsistent statements rendered the cases against Eman and Martin Soudani unprovable;

m. if cash was removed from the safes as alleged by Mout'z Soudani, Mout'z Soudani was the person who removed it;[25] and

n. that "it would be a miscarriage of justice to permit [Mout'z] Soudani to testify in the grand jury absent a waiver of immunity."

129. In response, EADA Rosenwasser emailed: "I acknowledge receipt of your letter of April 17, 2023, and attached list of real estate matters from 1990 and 1992. I will not take the liberty of responding to your concerns but will rather distribute the letter and enclosure to the District Attorney and members of the executive staff for their review and consideration. I will, of course provide any information requested of me in reaching a decision on your request for my recusal." Rosenwasser addressed none of the other issues the letter raised.

---

[25] On information and belief, despite the allegation that Mout'z Soudani kept the allegedly stolen cash and was committing financial crimes, the OCDA never issued a subpoena for his bank records for the period after October 31, 2023. That subpoena would have revealed multiple bribe checks to EADA Rosenwasser.

130.    On April 18, 2023, by email, EADA Rosenwasser forwarded the April 17, 2023 letter to DA Hoovler and seven OCDA assistant district attorneys, including Assistant District Attorney Edward Saslaw.

131.    On April 18, 2023, less than two hours after EADA Rosenwasser sent the email, ADA Saslaw responded, concluding, "I do not see how these ancient real estate transactions have any bearing on who is assigned to handle this case."

132.    ADA Saslaw's email response ignored the other concerns raised in the April 17 Letter, including Eman Soudani's reluctance (because of Rosenwasser's relationship with Mout'z Soudani) to tell Rosenwasser about the sexual abuse she endured, or the perception that the OCDA was denigrating or dismissing Eman Soudani's abuse allegations because of Rosenwasser's relationship with Mout'z Soudani.

133.    On information and belief, ADA Saslaw's perfunctory response represented the OCDA's entire conflict of interest investigation regarding EADA Rosenwasser and Mout'z Soudani.[26]

134.    On April 19, 2023, EADA Rosenwasser forwarded the email he sent to DA Hoovler on April 18, 2023 to Chief ADA Borek. Borek did not reply to the email.

135.    On information and belief, the source of which is the federal indictment and information obtained from the OCDA, at various times EADA Rosenwasser told DA Hoovler, Chief ADA Borek, and other OCDA personnel that the conflict allegations were frivolous, that he did not recall representing Mout'z Soudani as a private attorney, that he only knew Mout'z Soudani because he had purchased coffee and bagels from him, and that the defense was "full of shit" and not to be trusted.

---

[26] ADA Andrew Kass also replied to EADA Rosenwasser's email, but only to cite a legal case that he claimed discussed the "major cases" involving conflicts of interest. Kass's email also ignored the concerns raised in the April 17 Letter.

136.    DA Hoovler, Chief ADA Borek and the OCDA possessed evidence and information that proved EADA Rosenwasser lied to them about his relationship with Mout'z Soudani. Hoovler and Borek's administrative failures to supervise Rosenwasser, investigate the conflict, and comply with and enforce their own policies and legal obligations resulted in the deprivation of Eman and Martin Soudani's constitutional rights.

**Hoovler and Borek Permit Rosenwasser to Remain in Charge of the Criminal Cases; Soudani Tells Rosenwasser He Destroyed Evidence; Rosenwasser Presents Him to the Grand Jury Anyway, Gives Him Transactional Immunity; Martin Soudani is Indicted and Rosenwasser Takes Additional Bribe Payments.**

137.    The OCDA's website explains grand jury immunity in New York as follows: "A witness who receives transactional immunity can never be prosecuted for any crime involved in their testimony before the grand jury. Even witnesses who actually confess to crimes before a grand jury can never be prosecuted for those crimes. Prosecutors must be careful in deciding what witnesses to call before a grand jury, so that they do not immunize a witness for a crime, and must, when appropriate, demand that a witness waive transactional immunity."[27] *See also* N.Y. Criminal Procedure Law § 190.40.

138.    On May 6, 2023, days before he testified in the grand jury, Mout'z Soudani texted EADA Rosenwasser that he had destroyed evidence: "Number one my phone is clean everything that was bad is turned off or completely completely taken out …" (sic).



> **May 06, 2023 10:33:41 AM**
>
> Number one my phone is clean everything that was bad is turned off or completely completely taken out when i call you it's going to voicemail i have no other way to contact you except with text i don't know what you doing i want to start my day i have things to do please answer me

139.    On information and belief, the source of which is the federal indictment, on

---

[27] *FAQs*, OCDA (last visited May 19, 2025), https://www.orangecountygov.com/Faq.aspx?QID=118.

or about May 9 and May 11, 2023, Mout'z Soudani used cash to buy 10 money orders

totaling $10,000 and gave the money orders to EADA Rosenwasser.

 



 

 

 



140.    On May 10, 2023, EADA Rosenwasser called Mout'z Soudani to testify before an Orange County Grand Jury. Rosenwasser did not require Mout'z Soudani to testify under a waiver of immunity. As a result, under New York law, Mout'z Soudani obtained transactional immunity for the subject matter of his grand jury testimony.

141.    EADA Rosenwasser did not disclose to the Grand Jury, among other things, that Mout'z Soudani bribed him to investigate and prosecute Eman and Martin Soudani, wanted to see Eman and Martin Soudani "humiliated," or days earlier told Rosenwasser that he destroyed evidence on his phone.

142.    On May 12, 2023, the Grand Jury returned an indictment charging Martin Soudani with first-degree grand larceny and other crimes. The first-degree grand larceny charge, a class "B" felony, exposed Martin Soudani to a maximum jail sentence of 8 1/3 to 25 years.

143.    On information and belief, the source of which is the federal indictment, on or about May 15, 2023, EADA Rosenwasser deposited three of the money orders, totaling $3,000, that Mout'z Soudani had purchased.

144.    On information and belief, the source of which is the federal indictment, on or about May 24, 2023, EADA Rosenwasser deposited another two of the money orders, totaling $2,000.

145.    On information and belief, the source of which is the federal indictment, EADA Rosenwasser caused the remaining five money orders, totaling $5,000, to be paid to a law firm from "Stewart Rosenwasser."

146.    On information and belief, the source of which is the federal indictment, on or about June 18, 2024, Mout'z Soudani told federal law enforcement agents that EADA Rosenwasser directed Mout'z Soudani to pay him by cash or money order so that the money

would be more difficult to trace back to Mout'z Soudani.

147.    On or about May 17, 2023, Chief ADA Borek, as the Acting District Attorney of Orange County in the State of New York, provided Kathy Hochul, Governor of the State of New York, a sworn application for requisition upon the Governor of the State of Colorado for the return from Colorado of Martin Soudani. Borek relied on Rosenwasser's statements about the case and thus perpetuated Rosenwasser's fraud.

**Borek Meets with Eman Soudani, Disregards Soudani's Threats to and Sexual Abuse of Eman Soudani and Other Crimes; Still Does Not Investigate Rosenwasser's Relationship with Soudani**

148.    On June 2, 2023, Eman Soudani's defense again informed EADA Rosenwasser that Mout'z Soudani's threats caused her to fear for her physical safety.

149.    That same day, the defense provided EADA Rosenwasser and the OCDA written threats Mout'z Soudani communicated to Eman Soudani in March 2023, shortly after the defense told Rosenwasser about Eman Soudani's sexual abuse.[28] In addition to warning that Eman Soudani should shut her "big mouth," Mout'z Soudani threatened: "[s]o far, all the bad mouthing has reached me. I know every word [Eman and Martin Soudani] have said and trust me, it doesn't mean shit" and if these "hard times are extended and Eman lies about me, the more I will hurt her son for her." The threat concluded: "Do not fuck with me."

150.    On information and belief, EADA Rosenwasser told Mout'z Soudani about Eman Soudani's reports of sexual abuse and assured him the allegations would not be investigated.

151.    On June 15, 2023, the defense for Eman Soudani told Chief ADA Borek

---

[28] Rosenwasser knew, and the OCDA was on notice, of Eman Soudani's allegations of physical abuse at least since his videotaped encounter with her in Colorado, if not before.

and EADA Rosenwasser in writing that:

    a.  Mout'z Soudani made additional written threats to Eman Soudani;

    b.  Eman Soudani was "increasingly anxious to make a report," and wanted to meet with the OCDA "as soon as possible" because Mout'z Soudani's threats had "put her in fear for her life;"

    c.  Mout'z Soudani's son would be in New York with Eman Soudani and would corroborate her allegations of physical abuse;

    d.  Mout'z Soudani had threatened to "punish" Eman Soudani, and had referred to her as a "fucking c-nt;"

    e.  Mout'z Soudani's threats were criminal because he sought to intimidate Eman Soudani from telling law enforcement about his crimes by instilling in her a fear that he would injure her;

    f.  Mout'z Soudani stole money from Eman Soudani, including the proceeds of an insurance settlement;

    g.  Mout'z Soudani provided the defense the August 2016 certificate of disposition relating to his arrest in Ulster County, New York, for using his deceased wife's notary stamp to falsify documents;

    h.  With respect to the money allegedly stolen by Eman Soudani, Mout'z Soudani stated in writing that "I do not know how much money she had when leaving the house because I do not ask those questions, nor do I care."

152.    On or about June 29, 2023, Eman Soudani met voluntarily with Chief ADA Borek and other OCDA agents (the "June 29 meeting"). EADA Rosenwasser was not present. Borek represented in substance that, going forward, Borek or another Assistant

District Attorney would handle the matters involving Eman and Martin Soudani.

153.    At the June 29 meeting, Eman Soudani told Chief ADA Borek that Mout'z Soudani raped her in October 2022 and had subjected her and other family members to years of physical and sexual abuse. She also reported additional criminal conduct committed by Mout'z Soudani in Orange County within the last five years and provided information about the loan check from Mout'z Soudani to Steve Brescia (*see ¶* 124).

154.    On June 30, 2023, Eman Soudani's defense provided Chief ADA Borek and EADA Rosenwasser a text message directed at her from Mout'z Soudani on or about April 16, 2023 that stated, "Motherfucker, I swear to you I'm a going to get you and him one way, or another as it's a promise to come clean you bitch you have to."

155.    Thereafter, no one acting for the OCDA contacted Eman Soudani, Mout'z Soudani's son, Martin Soudani, or other Soudani family members in Colorado about Mout'z Soudani's abusive and threatening conduct or other criminal conduct.

156.    Later, in or about November 2023, after Eman Soudani sued Mout'z Soudani for abusing her, Mout'z Soudani referenced the June 29, 2023 meeting in a letter to Eman Soudani: "[t]he state police came out of that meeting and all said this is the biggest psychopath of a woman that we know. What a disturbed woman."[29]

**Rosenwasser Mocks Eman Soudani's Allegations of Sexual Abuse; Borek Fails to Discipline Him or to Investigate Red Flags of his Relationship with Soudani**

157.    On July 5, 2023, EADA Rosenwasser emailed Chief ADA Borek that one of Eman Soudani's lawyers was "full of shit," and referenced an upcoming meeting between Borek and the FBI Agent. His email mocked Eman Soudani's abuse allegations;

---

[29] For the avoidance of doubt, it is not alleged that Hoovler and Borek should have considered the November 2023 letter in determining whether to investigate Rosenwasser's relationship with Mout'z Soudani. The letter does, however, suggest that someone from the OCDA told Mout'z Soudani about the June 29, 2023 meeting and assured him that he would not be prosecuted for the criminal conduct Eman Soudani described.

Rosenwasser complained that he was "starting to feel like I'm getting forcibly raped."[30]

Record 625

| | |
|---|---|
| Sender Name | SRosenwasser@orangecountygov.com <SRosenwasser@orangecountygov.com> |
| Recipients | Borek, Christopher |
| Subject | Soudani |
| Created Date/Time - UTC-05:00 (M/d/yyyy)[DST] | 7/5/2023 1:28:52.000 PM |
| Submitted Date/Time - UTC-05:00 (M/d/yyyy)[DST] | 7/5/2023 1:28:42.000 PM |
| Delivered Date/Time - UTC-05:00 (M/d/yyyy)[DST] | 7/5/2023 1:28:42.000 PM |

| | |
|---|---|
| Body | Middlemiss is full of shit. She doesn't need passport to establish residency. As for her file on the Jordanian property, it's in litigation. I would have to talk to complainant about that. Don't trust Middlemiss. Looking forward to your FBI visit today. I'm starting to feel like I'm getting forcibly raped. Sent from my iPhone |
| Folder Name | SRosenwasser@orangecountygov.com.pst -> Inbox -> Soudani -> Middlemiss |
| Importance | Normal |
| Evidence number | • Microsoft - SRosenwasser@orangecountygov.com |
| Recovery method | • Parsing |
| Item ID | 35697 |

158.    At that point, EADA Rosenwasser had pocketed at least $40,000 in bribes from Mout'z Soudani.

159.    For years, Eman Soudani did not come forward to report Mout'z Soudani's sexual and physical abuse, in part because she thought no one would believe her because of Mout'z Soudani's power and influence in the local community. She hoped Chief ADA Borek would listen and take action. She was wrong.

160.    Chief ADA Borek dismissed Eman Soudani's reports out of hand, and never reprimanded EADA Rosenwasser for mocking her sexual abuse allegations or considered his comments as indicia of Rosenwasser's bias in favor of Mout'z Soudani. Instead, Borek included Rosenwasser in subsequent case meetings and on case-related emails, continued to rely on his assessment of the cases, and ignored his multiple violations of the OCDA

---

[30] Rosenwasser's email reference to "Middlemiss" is to one of Eman Soudani's defense attorneys. Eman Soudani had asked the OCDA to return certain property, including her passport.

email and text messaging policy. Any suggestion that Borek or the OCDA "re-evaluated" the cases following Rosenwasser's supposed removal from them but somehow missed the red flags of Rosenwasser's corruption is ridiculous.

161.    Chief ADA Borek devalued Eman Soudani as a human being and confirmed her worst fears about Orange County corruption.

**An FBI Agent Tells Borek that Rosenwasser as a Judge Took Loans From Soudani and Never Repaid Them and that Soudani is a Murder Suspect; Borek is Unfazed.**

162.    On July 7, 2023, Chief ADA Borek met with the FBI Agent. The FBI Agent told Borek that Mout'z Soudani admitted that, when EADA Rosenwasser was a judge, Mout'z Soudani "loaned" him $40,000 that Rosenwasser never repaid.[31]

163.    The FBI Agent also informed Chief ADA Borek that police in nearby Ramapo, New York considered Mout'z Soudani a suspect in their on-going cold case investigation of the 1979 murder of his first wife.

164.    Chief ADA Borek, an experienced prosecutor, knew or should have known that Rosenwasser lied about his relationship with Mout'z Soudani and that Rosenwasser's conduct tainted the cases against Eman and Martin Soudani. Borek should have complied with OCDA policies and his ethical obligations, searched Rosenwasser's phone, produced information to the defense, investigated Rosenwasser's misconduct, and dismissed the cases. Instead, Borek plowed ahead with the prosecutions against Eman and Martin Soudani. Borek's choice to proceed demonstrates his complicity in the bribery scheme, his managerial and administrative incompetence, or both.

165.    Chief ADA Borek failed in his administrative function to supervise EADA

---

[31] This should have raised alarm bells for Borek, as certain OCDA personnel had received information implicating Rosenwasser in bribe-receiving when he was a judge in Orange County. Walsh, J., *The Good Ol' Boys of Montgomery*, Intelligencer (Jan. 22, 2025), https://nymag.com/intelligencer/article/stewart-rosenwasser-moutz-soudani-eman-soudani-montgomery-ny.html.

Rosenwasser and to investigate misconduct within the OCDA. Proper supervision of Rosenwasser would have revealed what the Rockland County District Attorney's Office called a "dark picture of prosecutorial misconduct, abuse of discretion, and the abandonment of all ethical standards held sacred by prosecutors" that prejudiced the "entire criminal justice system."[32]

166.    Chief ADA Borek never told the defense for Eman and Martin Soudani that Rosenwasser lied to the OCDA about his relationship with Mout'z Soudani, and thus violated his own ethical obligations.

**After Borek's Supposed Removal of Rosenwasser From the Cases, Rosenwasser Tries to Access Case Evidence; Borek Invites Him to Attend a Meeting with the Defense for Martin Soudani**

167.    On information and belief, the source of which is the federal indictment, on or about July 6 to July 11, 2023, EADA Rosenwasser tried to gain access to case evidence, including Eman Soudani's seized phone; Chief ADA Borek supposedly stopped him.

168.    On or about July 23, 2023, defense counsel for Martin Soudani met with Chief ADA Borek. Despite Borek's supposed removal of EADA Rosenwasser from the cases, Borek nevertheless invited him to the meeting. Counsel for Martin Soudani demanded that Rosenwasser leave the meeting. Rosenwasser left.

**Borek Provides the Defense Disturbing Texts Between Rosenwasser and Soudani; Borek Still Does Nothing to Investigate Rosenwasser**

169.    On August 18, 2023, Chief ADA Borek produced to the defense the 76 text messages EADA Rosenwasser exchanged with Mout'z Soudani between December 23, 2022 and January 19, 2023 referenced above, ¶ 80.

170.    Based on the 76 text messages alone, the OCDA knew or should have

---

[32] RCDA Letter Reply to Mot. Pursuant to CPL 440.10, *People v. Soudani*, Ind. No. 70368-23/001 (Orange Cty. Ct. Oct. 4, 2024).

known that Rosenwasser:

    a.  used his personal phone to exchange case-related information with Mout'z Soudani in violation of the OCDA's policy;

    b.  planned to leverage his personal relationship with Eman Soudani when he encountered her in Colorado;

    c.  received a text from Mout'z Soudani promising to make Rosenwasser "extremely more than happy;"

    d.  visited Mout'z Soudani's home the day after Christmas; and

    e.  lied when he claimed he knew Mout'z Soudani only from buying coffee and bagels.

171.    As noted, in April 2023, EADA Rosenwasser did not include the December 23, 2022 to January 19, 2023 texts in the April 2023 discovery production, despite the defense request that Rosenwasser be recused.

172.    As evidenced by the OCDA email and text messaging policy he endorsed and distributed to OCDA staff, Chief ADA Borek knew it was his job to oversee, review, preserve, and disclose the texts between EADA Rosenwasser and Mout'z Soudani. Among Borek's administrative shortcomings are his failure to question how the search parameters for the January 19, 2023 imaging of Mout'z Soudani's phone were established, or why they captured text messages from such a limited timeframe. Nor did he comply with the OCDA email and text messaging policy by investigating whether Rosenwasser and Mout'z Soudani exchanged additional texts. Had Borek done so, he would have learned that, in November and December 2022 alone, Rosenwasser and Mout'z Soudani exchanged about 200 text messages and 26 phone calls. He also would have discovered that Rosenwasser and Mout'z Soudani exchanged at least 380 text messages and at least 64 phone calls

between November 2022 and January 2024.

173.    In the alternative, Chief ADA Borek knew there were additional text messages between Rosenwasser and Mout'z Soudani and intentionally violated OCDA policy and his ethical obligations by failing to disclose them.

**Borek Insists Eman Soudani Sign a Release of Civil Liability in Exchange for Dismissal; Rosenwasser Takes Another Bribe Payment from Mout'z Soudani**

174.    On September 12, 2023, Eman Soudani met with Chief ADA Borek at the OCDA office and executed an agreement to dismiss the felony complaint. The agreement required Eman Soudani to testify truthfully if called as a witness at Martin Soudani's trial. Borek conditioned the dismissal on Eman Soudani's agreement to execute a release from civil liability and waive any claim that the OCDA "engaged in illegal activity."

175.    Chief ADA Borek was a prosecutor for about 30 years. He knew the release was unenforceable, unethical, and that "release-dismissal agreements present an unacceptable risk of impairing the integrity of the criminal justice process." *See Cowles v. Brownell*, 73 N.Y.2d 382 (1989).[33] He also knew that discovery and motion practice would expose his mismanagement and EADA Rosenwasser's lies.

176.    If Eman Soudani knew about the bribes Mout'z Soudani paid to EADA Rosenwasser or the extent of the conflict between Rosenwasser and Mout'z Soudani (about which Chief ADA Borek either knew or should have known at the time), she would not have executed the agreement.

---

[33] The New York Court of Appeals stated in *Cowles* that, "the practice of requiring the release of civil claims in exchange for dismissal of charges simply to insulate a municipality or its employees from liability can engender at least an appearance of impropriety or conflict of interest." If a prosecutor determines a defendant is innocent, or that the case against him cannot be proved, the prosecutor is under an "ethical obligation to drop the charges without exacting any price for doing so." Further, the Court stated, "[i]nsulation from civil liability is not the duty of the prosecutor." *Cowles*, 73 N.Y.2d at 386-87. *See also United States v. Sexton,* 804 F.2d 26 (2d Cir. 1986)(release-dismissal agreements are "inherently suspect").

177.    On or about September 13, 2023, Mout'z Soudani wrote a check for $3,100 to EADA Rosenwasser. Rosenwasser deposited the check on September 14, 2023.

 

**Notwithstanding Rosenwasser's Lies and Misconduct, DA Hoovler Presents Him Law Enforcement Awards**

178.    On or about September 28, 2023, DA Hoovler announced that the Detectives Crime Clinic for Metropolitan New Jersey and New York had recognized EADA Rosenwasser as the "Outstanding Law Enforcement Executive" for his work on an arson case. Hoovler presented Rosenwasser with the award.

179.    On or about November 14, 2023, DA Hoovler announced that the local chapter of the International Association of Arson Investigators awarded EADA Rosenwasser with "Arson Prosecutor of the Year" for his work on the same arson case. The announcement noted that, 21 years earlier, Hoovler won the same award for his work on a case tried before then-Judge Rosenwasser.

**Martin Soudani Bows to OCDA's Corrupt Power and Pleads Guilty; Soudani Receives a Restitution Check and Pays Rosenwasser Another Bribe**

180.    In November 2023, the OCDA made a plea offer that, under the circumstances, Martin Soudani could not refuse. The deal was to plead guilty to a lesser offense in return for an indeterminate prison sentence of from one to seven years and payment of restitution. When the offer was made, Martin Soudani had been incarcerated

since March 8, 2023. He knew accepting the plea offer would likely result in his release from jail within months rather than as much as 25 years.

181.    On November 28, 2023, Martin Soudani pleaded guilty to one count of grand larceny in the third degree, a class "D" felony, before the Honorable Hyun Chin Kim.

182.    Martin Soudani pleaded guilty not because he was guilty, but because, among other things, i) he believed EADA Rosenwasser was a powerful prosecutor with a corrupt relationship to Mout'z Soudani; ii) he feared a jury could convict him if it believed Mout'z Soudani; iii) he was struck by the OCDA's unwavering reliance on Mout'z Soudani's word and the abrupt way it rejected his defenses, including evidence that the money he allegedly stole was from a trust of which he was the beneficiary; and iv) he believed the OCDA would further prosecute his mother if he did not plead guilty. The pressure to plead was enormous, as Martin Soudani faced a prison sentence of up to 8 1/3 to 25 years if he were convicted after trial.[34]

183.    When he pleaded guilty, neither Martin Soudani nor the Court knew about Mout'z Soudani's bribe payments to EADA Rosenwasser, the extent of Rosenwasser's lies, his financial interest in the matter's outcome, the texts demonstrating that Mout'z Soudani destroyed evidence, or the extent of Rosenwasser and Mout'z Soudani's corrupt relationship and the OCDA's knowledge thereof.

184.    If EADA Rosenwasser revealed that he took bribes from Mout'z Soudani,

---

[34] It is worth noting that, in October 2024, the Kings County District Attorney's Office vacated the conviction of a man who had pleaded guilty to murder to avoid a longer prison sentence. In announcing the exoneration, District Attorney Eric Gonzalez noted that "like many others, [the defendant] found himself trapped by a system that failed to recognize his innocence, and nearly 20 years ago, he pleaded guilty just to stay out of prison. Our reinvestigation revealed the deep flaws in the original case—unreliable testimony, overlooked evidence, and a rushed investigation." *Brooklyn District Attorney Moves to Vacate Conviction of Man Who Pleaded Guilty to 1986 Killing so He Could Stay Out of Prison After Successful Appeal*, Brooklyn District Attorney's Office (Oct. 3, 2024), http://www.brooklynda.org/2024/10/03/brooklyn-district-attorney-moves-to-vacate-conviction-of-man-who-pleaded-guilty-to-1986-killing-so-he-could-stay-out-of-prison-after-successful-appeal/.

or Chief ADA Borek admitted to the defense that he knew Rosenwasser lied about his relationship with Mout'z Soudani, Martin Soudani never would have pleaded guilty. The OCDA's intentional concealment of the flaws in its tainted prosecution resulted in Martin Soudani's decision to plead guilty to a crime he did not commit.[35]

185.    On January 5, 2024, Chief ADA Borek, on behalf of the OCDA, issued a restitution check to Mout'z Soudani in the amount of $478,286.42.



186.    On information and belief, the source of which is the federal indictment, on or about January 7 and 8, 2024, EADA Rosenwasser called Mout'z Soudani approximately seven times.

187.    On or about January 8, 2024, Mout'z Soudani wrote a check for $15,000 to EADA Rosenwasser. Rosenwasser deposited the check the next day, on January 9, 2024.

---

[35] Martin Soudani was entitled to make his decision to plead guilty "with full awareness of favorable material evidence known to the government." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

 

CK #1311     PD 01/09     $15000.00

188.     In total, during the period from November 10, 2022 to January 9, 2024, Mout'z Soudani paid at least $58,000 in bribes to EADA Rosenwasser.

189.     On March 6, 2024, Martin Soudani was sentenced to an indeterminate sentence of one to seven years jail.

**Evidence of Rosenwasser and Soudani's Corruption Scheme is Uncovered; Martin Soudani's Conviction is Quickly Vacated; Federal Authorities Indict Rosenwasser and Mount's Soudani; Rosenwasser Dies By Suicide**

190.     On or about June 18, 2024, FBI agents interviewed EADA Rosenwasser. On information and belief, federal law enforcement agents executed a search warrant in the OCDA's offices and questioned DA Hoovler and Chief ADA Borek.

191.     On or about June 21, 2024, EADA Rosenwasser resigned his position with the OCDA and retired from the practice of law, effective immediately.

> **From:** Stewart Rosenwasser ████████████████████
> **Date:** June 21, 2024 at 10:24:00 AM EDT
> **To:** "Hoovler, David" <DHoovler@orangecountygov.com>
> **Subject:** [EXTERNAL] My Status
>
> Caution! This message was sent from outside your organization.
>
> Dave:
> This is to advise you that I am retiring from the practice of law and therefore am leaving my position in the Orange County District Attorney's Office, effective immediately.
> Thank you for the opportunity to be a part of your office and serve the people of Orange County.
> Stewart Rosenwasser
> Sent from my iPhone

192.     On information and belief, even after the federal search warrant was

executed at the OCDA, after federal agents questioned DA Hoovler and Chief ADA Borek about EADA Rosenwasser's relationship with Mout'z Soudani, and after Rosenwasser resigned, the OCDA did not investigate Rosenwasser's relationship with Mout'z Soudani and his handling of the OCDA's investigation and prosecution of Eman and Martin Soudani. Nor did the OCDA investigate or prosecute Mout'z Soudani for the crimes he committed, including the rape of his sister, Eman Soudani. In addition, the OCDA never notified Martin Soudani of evidence or information that tended to negate his guilt or mitigate the degree of the offense. *See* New York Rules of Professional Conduct, Rule 3.8.

193.    In or about June 2024, during the discovery process in Eman Soudani's lawsuit against Mout'z Soudani under the New York Adult Survivors Act, Eman Soudani obtained bank records that evidenced EADA Rosenwasser and Mout'z Soudani's bribery scheme.[36]

194.    On July 3, 2024, Martin Soudani was released from jail on parole. He remained under post-release supervision.

195.    On or about July 24, 2024, a federal court ruled that the bank records evidencing the bribery scheme could be used outside of the federal lawsuit.[37]

196.    On August 16, 2024, citing the bank records evidencing the bribery scheme, Martin Soudani filed the 440.10 Motion to vacate his conviction and dismiss the indictment on grounds that his conviction was procured by duress, misrepresentation, and fraud and that the misconduct violated his state and federal constitutional rights.

197.    On August 30, 2024, Walden Saving Bank filed a complaint in New York State Supreme Court, Orange County, against Rosenwasser and his private law firm,

---

[36] Plaintiff's Motion for Clarification on Propriety of Confidentiality Designation Under Protective Order, *Soudani v. Soudani*, No. 7:23-cv-09905-PMH (S.D.N.Y. June 13, 2024), ECF Nos. 58-63.
[37] Order, *Soudani v. Soudani*, No. 7:23-cv-09905-PMH (S.D.N.Y. July 24, 2024), ECF No. 79 (unpublished).

Rosenwasser Law, P.C. to collect $362,221.16 Rosenwasser owed the bank (the "Walden Complaint"). The debt resulted from a $450,000 loan to the law firm, which Rosenwasser personally guaranteed in April 2018, about a year before the OCDA hired Rosenwasser.

198.    On or about September 6, 2024, the OCDA recused itself from the 440.10 Motion.

199.    On September 6, 2024, the response to the 440.10 Motion was assigned by the Orange County Supreme Court (Kim, J.) to the RCDA.

200.    On or about September 11, 2024, the Walden Complaint was served on Rosenwasser Law, P.C. via the New York State Secretary of State.[38]

201.    On information and belief, it is a standard procedure at multiple New York prosecutor's offices to inquire about whether new hires have significant outstanding debt, among other reasons, so that the hiring office is aware of a risk of possible compromise.

202.    On information and belief, the OCDA did not inquire about whether EADA Rosenwasser was responsible for significant debt. Nor at any point after learning that EADA Rosenwasser lied about his relationship with Mout'z Soudani, or that Rosenwasser failed to repay a loan to Mout'z Soudani, did the OCDA investigate whether Rosenwasser was susceptible to compromise because he carried substantial debt.

203.    On September 24, 2024, federal prosecutors in the Southern District of New York unsealed an indictment charging Rosenwasser and Mout'z Soudani in connection with the bribery scheme. The indictment also charged Mout'z Soudani with Interstate Threats, in violation of 18 U.S.C. §§ 875(c) and (2), for the threats Mout'z Soudani's made against Eman Soudani and other Soudani family members.

---

[38] *Walden Savings Bank v. Rosenwasser Law, PC et al.*, Index No. EF007234-2024 (Sup. Ct. Orange Cnty. 2024).

204.    On September 24, 2024, Rosenwasser died by apparent suicide when federal authorities tried to arrest him at his home.[39]

205.    The federal criminal case against Mout'z Soudani is pending.[40]

206.    On or about October 5, 2024, the RCDA filed its response to the 440.10 Motion. The RCDA stated that "extreme misconduct" occurred, that the evidence "paints a dark picture of prosecutorial misconduct, abuse of discretion, and the abandonment of all ethical standards held sacred by prosecutors," that the "criminal justice system was prejudiced," and that the conviction was obtained by "unconscionable means."[41]

207.    On October 15, 2024, the Court granted the 440.10 Motion without a hearing. The Court vacated Martin Soudani's conviction, dismissed the indictment, and confirmed that the restitution order was null and void.

208.    The Court found that Martin Soudani's conviction was obtained by duress, misrepresentation, and fraud and that the misconduct violated his state and federal constitutional rights. The Court held that "[t]he clear omission of the payments made by [Mout'z Soudani] and received by Rosenwasser constitutes a glaring misrepresentation, regardless of the actual knowledge of the OCDA, by a person acting on behalf of the prosecution."[42] The Court also held that, because Rosenwasser "initiated the investigation, gathered the investigative materials using the power of the Grand Jury, presented the matter to a Grand Jury, including immunizing the testimony of [Mout'z Soudani], all the while accepting and possessing a pecuniary interest in the case, **the entire proceeding which**

---

[39] Bellamy, L., *Ex-prosecutor accused of taking bribes ends own life after firing at FBI*, Times Union (Sept. 24, 2024), https://www.timesunion.com/hudsonvalley/news/article/stewart-rosenwasser-fbi-raid-shooting-19788954.php.
[40] *United States v. Rosenwasser and Soudani.*, No. 7:24-CR-00555 (CS) (S.D.N.Y.).
[41] Letter Reply to Mot. Pursuant to CPL 440.10 at 2-3, *People v. Soudani*, Ind. No. 70368-23/001 (Orange Cnty. Ct. Oct. 4, 2024).
[42] Decision and Order at 4. *People v. Soudani*, Ind. No. 70368-23/001, at 4 (Orange Cnty. Ct. Oct. 15, 2024).

55

**yielded the Indictment can be nothing less than tainted**" (emphasis added).[43]

**The OCDA Ignored Multiple Red Flags of a Corrupt and Conflicted Relationship Between EADA Rosenwasser and Mout'z Soudani**

209.    In September 2024, in response to local news reports on the 440.10 Motion, DA Hoovler stated: "There was no way that I, or anyone in my office, could have been aware of Mr. Rosenwasser receiving money outside of the office."[44]

210.    DA Hoovler's statement is not true.

211.    As noted above, throughout the OCDA's prosecution of the cases against Eman and Martin Soudani, the defense sought EADA Rosenwasser's recusal based upon his relationship with and prior representation of Mout'z Soudani, and his apparent predisposition and bias towards Mout'z Soudani. The defense also directed the OCDA to Mout'z Soudani's inconsistent statements, threats, sexual abuse of his sister and other family members, past crimes of moral turpitude, and continuing criminal activity. It was highly unusual for an honest prosecutor to disregard these kinds of allegations, either in the pre- or post-charging stages of a prosecution. The bribes explain Rosenwasser's conduct. That the OCDA, DA Hoovler, and Chief ADA Borek disregarded the evidence and embraced EADA Rosenwasser's flimsy lies can be explained only by their complicity in the bribery scheme or their administrative and managerial incompetence.

212.    The red flags of which DA Hoovler and Chief ADA Borek were on notice or should have been on notice include but are not limited to:

    a.    Rosenwasser's reputation as a judge for taking bribes in return

            for judicial outcomes;

---

[43] *Id.*

[44] Bellamy, L., *Ex-prosecutor accused of taking bribes ends own life after firing at FBI*, Times Union (Sept. 24, 2024), https://www.timesunion.com/hudsonvalley/news/article/soudani-case-alleged-bribery-rosenwasser-19779708.php.

b.  Rosenwasser's insistence that he handle the cases against Eman and Martin Soudani despite his practice of handling only few and select cases;

c.  The 76 texts Rosenwasser exchanged with Mout'z Soudani between December 23, 2022 and January 19, 2023, all on Rosenwasser's personal phone, in violation of OCDA policy and recovered by the OCDA from Mout'z Soudani's phone;

d.  Rosenwasser's failure to include these 76 texts in the April 2023 discovery production to the defense;

e.  The approximately 380 texts and 64 phone calls Rosenwasser exchanged with Mout'z Soudani from in or about November 2022 to January 2024;[45]

f.  Texts establishing that Rosenwasser lied when he denied a substantive relationship with the Soudani family, including his boast that he could leverage his personal relationship with Eman Soudani: "I think when Eman sees me [in Colorado], its all over;"

g.  Texts between Rosenwasser and Mout'z Soudani that suggested the two maintained a corrupt relationship, including Mout'z Soudani's promise that "at the end," Rosenwasser would be "extremely more than happy;"

---

[45] OCDA employees, including Rosenwasser, were on notice that sending case-related text messages from their personal phones could subject their phones to search. Per the OCDA email and text messaging policy "[t]he use of such devices would result in requiring that the device be searched for <u>Rosario</u> and/or <u>Brady</u> material." Thus the OCDA had access to Rosenwasser's phone and was in constructive possession and control of its contents.

h.  Texts between Rosenwasser sent to Mout'z Soudani that indicated that Rosenwasser sought to conceal their relationship;

i.  Rosenwasser's demonstrable lies that he did not recall representing Mout'z Soudani on civil and criminal matters and lacked even a "social" relationship with the Soudani family;

j.  Police body camera footage which revealed Rosenwasser's personal relationship with the Soudani family, suggested that Mout'z Soudani engaged in prior corrupt activity, and corroborated Eman Soudani's allegations that Mout'z Soudani subjected her to long-term physical abuse;

k.  A video statement wherein Martin Soudani told law enforcement about an existing corrupt relationship between Rosenwasser and Mout'z Soudani;

l.  Written materials recovered during the Colorado search warrant that referred to the longstanding and corrupt relationship between EADA Rosenwasser and Mout'z Soudani;

m.  Information from the FBI Agent that Mout'z Soudani made an unrepaid loan to Rosenwasser when Rosenwasser was a judge;

n.  Information from the FBI Agent that Mout'z Soudani was a suspect in the homicide of his first wife;

o.  The "loan" check Mout'z Soudani's wrote to local politician Steve Brescia, who in 2021 resigned from his position on the Orange County Industrial Development Agency ("IDA") as a

result of an OCDA investigation;[46]

p.  Rosenwasser's minimization of and refusal to investigate the crass, violent, and extortionate threats Mout'z Soudani made after Eman Soudani reported his sexual abuse;

q.  Rosenwasser's denigration of Eman Soudani's allegations of sexual abuse, i.e., that Rosenwasser was "starting to feel like I'm getting forcibly raped;"

r.  Rosenwasser's threat to preclude Eman Soudani from testifying in the grand jury that Mout'z Soudani sexually and physically abused her or about his motive to bring charges against her;

s.  Rosenwasser's minimization of Mout'z Soudani's inconsistent sworn statements about the amount of cash supposedly stolen by Eman Soudani;[47]

t.  Rosenwasser's disregard of Mout'z Soudani's acts of moral turpitude when evaluating his credibility, including the illegal use of his deceased wife's notary stamp;

u.  Rosenwasser's disregard of Mout'z Soudani's contradictory statements regarding whether he gave Martin Soudani authority to invest in cryptocurrency;

v.  Rosenwasser's refusal to investigate Mout'z Soudani's

---

[46] That Mout'z Soudani loaned money to local politicians such as Brescia corroborates Eman Soudani's belief that Mout'z Soudani exercised power and influence in the community, and that no one would believe her about the abuse she suffered at the hand of Mout'z Soudani if she came forward.

[47] With respect to the cash: 1) Soudani told Investigator Spampinato under oath that the amount exceeded $550,000; 2) Rosenwasser swore in the February 24 Affidavit that Soudani told him the amount exceeded $350,000; 3) Soudani demanded $150,000 to make it "as if nothing ever happened;" and 4) Soudani wrote, "I do not know how much money she had when leaving the house because I do not ask those questions, nor do I care."

involvement in other criminal activity, including:

      i.  theft of an insurance settlement from Eman Soudani;

     ii.  operation of an unlicensed check cashing and money transmitting business from his residence;

    iii.  tax crimes;

    iv.  possession of firearms;[48] and

     v.  possession of illegal drugs, including date rape drugs;

w.  Evidence that the money Martin Soudani allegedly stole was taken from a trust account of which he was the beneficiary;

x.  Rosenwasser's debt, i.e., that he was personally responsible to repay a bank loan of at least $360,000; and

y.  Rosenwasser's attempts to access case evidence after Borek supposedly removed him from the case.

213.    DA Hoovler and Chief ADA Borek's decision not to investigate the red flags was a management failure that resulted in the deprivation of Eman and Martin Soudani's constitutional rights.

214.    On information and belief, DA Hoovler and Chief ADA Borek did not investigate the red flags or Rosenwasser's relationship with Mout'z Soudani, among other reasons, because they wanted to lead what they considered to be a high-profile cryptocurrency-related prosecution, and because they feared public exposure of Rosenwasser's conflict and corruption would embarrass them. Hoovler and Borek thereby facilitated the bribery scheme and knowingly, intentionally, and maliciously violated Eman

---

[48] On information and belief, the source of which is in-court representations made by federal prosecutors, when federal agents arrested Mout'z Soudani, multiple firearms were recovered from his residence.

and Martin Soudani's constitutional rights.

215.    Chief ADA Borek's blatant disregard of the red flags and his continued reliance on Rosenwasser for information about the case renders any purported "re-evaluation" of the case by him or the OCDA a farce.

**Orange County Requires Disclosure of Gifts, Fails to Train or Enforce Policy; Rosenwasser Lies on Forms**

216.    Orange County requires certain employees to submit an annual disclosure form, signed under penalty of perjury, listing all money, services, meals, loans, or items with monetary value over $75 received. OCDA prosecutors are prohibited from accepting or soliciting various benefits, including "money," "loans," and "meals" valued at over $75 within a 12-month period from any one person, or any "financial benefit under circumstances in which it could be reasonably be inferred that the [benefit] was intended to influence" the prosecutor "in the performance of [his] official duties."

217.    Rosenwasser was required to report the money he took from Mout'z Soudani on the annual disclosure form.

218.    On or about May 9, 2023 and on or about February 20, 2024, EADA Rosenwasser submitted financial disclosure forms to Orange County, under penalty of perjury, falsely listing no receipt of money, loans, or meals valued at over $75 from the same person during the prior year.

219.    DA Hoovler and Chief ADA Borek did not adequately train OCDA employees, including EADA Rosenwasser, on the use of the conflict form.

**DA Hoovler's and Chief ADA Borek's Pattern of Ignoring Conflicts of Interest – the McDonald Matter**

220.    The prosecution of Eman and Martin Soudani is not the only recent matter

in which DA Hoovler, Chief ADA Borek, and EADA Rosenwasser disregarded evidence that contradicted a senior OCDA prosecutor's claim that he did not have a conflict of interest in a high-profile case.

221.    The facts alleged in this section are based on information and belief, the sources of which include press reports and websites about the murder of Megan McDonald and Hoovler's role in the investigation as a private defense attorney and as District Attorney.

222.    In 2003, 20-year-old Megan McDonald was murdered and her body was found in Orange County, New York. The resulting investigation to identify her murderer lasted for years.

223.    In 2008, Hoovler was employed as a private defense attorney at Rosenwasser's law firm, Ostrer Rosenwasser, LLP. While so-employed, Hoovler represented an individual named Andre Thurston. Thurston died in 2010.

224.    From 2008 to 2011, Hoovler spoke multiple times with OCDA ADA Mary Ellen Albanese ("ADA Albanese"), who was handling the McDonald murder investigation. ADA Albanese kept contemporaneous written notes of her conversations with Hoovler.

225.    During these conversations, Hoovler did not reveal his client's name.

226.    Hoovler told ADA Albanese that his client had paid him. He also told ADA Albanese, in substance, that in return for a favorable plea deal, his client could provide the identities of two other participants in the murder, their motive (which Hoovler said differed from the then-current police theory), and the murder weapon's location.

227.    Hoovler was sworn in as District Attorney on January 1, 2014. Because of his work as a criminal defense attorney, DA Hoovler recused himself and the OCDA from some 50 cases where there was either a conflict of interest or the appearance thereof.

228.    DA Hoovler did not recuse himself or the OCDA from the high-profile McDonald murder case, despite his legal representation of Thurston, a suspect who – according to Hoovler – admitted participating in the murder, and knew the identity of two other participants, their motive, and location of the murder weapon.

229.    The attorney-client privilege covered the information Thurston provided Hoovler. If Thurston told Hoovler the identities and conduct of the participants in the murder, their motive, and the location of the murder weapon, as Hoovler claimed, he was prohibited from disclosing it to anyone, even after Thurston's death.

230.    This created a conflict, or the appearance thereof, for Hoovler as DA. The conflict necessitated his recusal from the McDonald investigation. Indeed, if anything Thurston told him about the murder constituted potential *Brady* or *Giglio* information for anyone ultimately charged with Ms. McDonald's death, DA Hoovler would be precluded from disclosing it to prosecutors in his office or to the defense.

231.    In or about 2019, DA Hoovler admitted to the police and members of the OCDA that Thurston was the client he had discussed with ADA Albanese.

232.    In or about 2019 ADA Albanese retired from the OCDA. ADA Christopher Kelly ("ADA Kelly") took over the McDonald murder investigation for the OCDA.

233.    At various times during Hoovler's tenure as DA, the New York State Police asked him to recuse himself from the McDonald murder investigation. Hoovler declined.

234.    Sometime after the State Police identified a man named Edward Holley as a suspect, DA Hoovler personally contacted Holley's attorney to offer Holley a plea deal if he provided information about the murder. Hoovler did not inform the State Police or the McDonald family about the conversation or the offer to Holley.

235.    In October 2022, DA Hoovler posted images of a Megan McDonald

billboard offering a $10,000 reward and the Crime Hotline phone number on his "David M. Hoovler Orange County DA" Facebook page. Hoovler wrote: "It would be a great day to solve this case! Are you somebody that holds the key information to solve this case? Come forward ... the system works when citizens participate! Make that call - tell us what you know ... you can remain anonymous!"

236.    By March of 2023, ADA Kelly concluded that there was sufficient evidence to charge Holley with the McDonald murder and wrote a prosecution memo in which he recommended presenting evidence against Holley to a grand jury. DA Hoovler, Chief ADA Borek, and EADA Rosenwasser disagreed with ADA Kelly.

237.    Notwithstanding ADA Albanese's notes memorializing Hoovler's admissions that Thurston had paid him and was Hoovler's client, now-DA Hoovler denied that Thurston paid him. Chief ADA Borek and EADA Rosenwasser disregarded ADA Albanese's notes and concluded that Hoovler was not conflicted from the case. Once again, Hoovler, Borek, and Rosenwasser ignored the evidence at their disposal to reach the conclusion that suited their interests.

238.    On or about April 20, 2023, frustrated by DA Hoovler's refusal to authorize Holley's arrest, the State Police arrested Holley and charged him with McDonald's murder.

239.    Immediately after Holley's arrest, DA Hoovler issued a statement that the OCDA would "continue to prioritize the investigation and prosecution of the death of Megan McDonald and continue to work closely with our law enforcement partners."[49]

240.    DA Hoovler's refusal to recuse himself and the OCDA from the McDonald case, the clandestine conversation between Hoovler and Holley's attorney wherein Hoovler

---

[49] *District Attorney Hoovler responds to press inquiries regarding the arrest of Edward Holley*, OCDA (Apr. 20, 2023), https://www.orangecountygov.com/CivicAlerts.aspx?AID=1761.

made a plea offer, and Hoovler's position that the evidence was insufficient to charge

Holley resulted in negative publicity for Hoovler and the OCDA.

241.    On information and belief, DA Hoovler used his personal phone to text,

email, and otherwise communicate case-related information about the McDonald matter in

violation of OCDA email and text messaging policy.

242.    On April 26, 2023, the OCDA finally asked to be recused from the

McDonald case, and a Special Prosecutor was appointed.[50] In a statement, DA Hoovler

admitted that in private practice he "represented a client in negotiations with the District

Attorney's office regarding potential information that client might provide regarding Ms.

McDonald's death."[51]

243.    The OCDA's policy and practice regarding the identification of and reaction

to conflicts of interest involving its senior staff was deficient. Just as in the Soudani matter:

a.  DA Hoovler and the OCDA failed to institute effective policies
and procedure to identify and investigate conflicts of interest;

b.  A senior prosecutor violated the OCDA email and text
messaging policy by sending case-related communications
using his personal phone;

c.  DA Hoovler and members of his staff disregarded evidence in
the OCDA's possession that belied a senior prosecutor's claim
about the nature of his relationship with a witness or defendant;

---

[50] *District Attorney Hoovler requests Special Prosecutor in Edward Holley Case*, OCDA (Apr. 26, 2023), https://www.orangecountygov.com/civicalerts.aspx?aid=1765.
[51] *Id.* In February 2024, DA Hoovler also referred to Thurston as his client: "Ethical rules prevent me from making any further comments about a former client." Gomez, B., *State police 'not sure' about leaked documents in Edward Holley case*, news12 Westchester (Feb. 5, 2024), https://westchester.news12.com/state-police-not-sure-about-leaked-documents-in-edward-holley-case.

d.  DA Hoovler and members of his staff performed their oversight and management duties in a self-interested manner that favored publicity over compliance;

e.  When evidence mounted of a conflict of interest, DA Hoovler tried to minimize public scrutiny and embarrassment by offering an unusual plea deal to resolve a high-profile case; and

f.  Because of its ineffective and deficient policies and procedures, the OCDA was not recused from the case until the conflict became the subject of intense and embarrassing public scrutiny.

**The IDA Matter and Hoovler's Public Statements About Conflicts of Interest**

244.  In 2021, DA Hoovler and the OCDA also received intense public criticism regarding the above-referenced IDA matter on two primary bases: 1) the perception that Hoovler was too lenient with respect to the criminal penalties imposed on the three convicted IDA board members; and 2) the perception that Hoovler had a conflict of interest because one of the defendants was represented by a former law partner of Hoovler and EADA Rosenwasser (who worked on the IDA case).

245.  DA Hoovler stated that the conflict issue was baseless under state law, and that the only time prosecutors may face conflicts of interest after leaving private practice is if they know a defendant or represented one with an active criminal case.[52]

246.  Of his critics, Hoovler said, "They're obviously idiots, because there can be no conflict of interest if the law says there's no conflict."[53]

---

[52] McKenna, C., *Democrats question why defendants in Orange County corruption case will serve no jail time*, Times Herald-Record (June 29, 2021). Hoovler's reasoning, of course, would have disqualified Rosenwasser from the OCDA's prosecution of Eman and Martin Soudani.
[53] *Id.*

247.    The IDA prosecution resulted in the conviction by guilty plea of three IDA board members. Steve Brescia (who received a "loan" check from Mout'z Soudani), was the Chairman of the IDA Board. He was not prosecuted but was forced to resign. According to a joint report issued by the OCDA and the New York State Comptroller, the OCDA interviewed Brescia, a local Orange County legislator and at one time the Mayor of the Village of Montgomery, and Brescia was removed from the IDA Board of Directors.[54]

248.    As DA Hoovler noted about the IDA case:

> IDA funds are public monies and those who accept appointment to the Board of Directors owe a duty to act diligently in exercising oversight over the operations to the public authority they serve and are required by the statutory fiduciary duty which all Board Member are bound by and swear an oath to uphold [sic]. The **sad fact** is that these crimes could not have been committed had other officials at the IDA acted responsibly[55] (emphasis added).

249.    DA Hoovler was right. The "sad fact" is he failed to take heed.

250.    Hoovler, Borek and Rosenwasser owed a duty to act diligently in exercising oversight over the OCDA's operations, i.e., the public authority they served, and were required to do so by the statutory fiduciary duty which all prosecutors are bound by and swear an oath to uphold. The sad fact is that the deprivation of Eman and Martin Soudani's constitutional rights would not have occurred if Hoovler and Borek acted responsibly.

### COUNT ONE: ABUSE OF PROCESS (FOURTEENTH AMENDMENT)
42 U.S.C. § 1983
*Against Defendants Hoovler, Borek, and Rosenwasser (in their individual capacities)*

251.    Plaintiffs incorporate by reference each and every allegation contained in

---

[54]*Report on the Joint Investigation of the Orange County Industrial Development Agency* (Sept. 2021), https://www.osc.ny.gov/files/reports/pdf/joint-investigation-orange-co-ida.pdf.
[55] *DA Hoovler Announces Felony Guilty Pleas In Orange County Industrial Development Agency Case*, OCDA (June 21, 2021), https://www.orangecountygov.com/CivicAlerts.aspx?AID=1273&ARC=2083.

the preceding paragraphs as if set forth fully herein.

252.    Hoovler, Borek, and Rosenwasser individually, collectively, acting in concert and aiding and abetting one another and Soudani, (1) employed regularly issued legal process to compel performance or forbearance of an act, (2) with intent to do harm without excuse or justification, (3) in order to obtain a collateral objective that is outside the legitimate ends of the process, (4) and in so doing denied Eman and Martin Soudani their constitutional right to due process. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional violations committed.

253.    Rosenwasser accepted money, to wit, about $58,000, to investigate, cause the arrest of, detain, and prosecute Eman and Martin Soudani at the behest of Mout'z Soudani, because Mout'z Soudani wanted to see Eman and Martin Soudani humiliated and punish them for escaping his domination and control.

254.    Rosenwasser intertwined his exercise of prosecutorial discretion to investigate, gather evidence, detain, arrest, and bring charges against Eman and Martin Soudani to an unauthorized demand for a bribe. No statute would authorize those acts under any circumstances.

255.    Rosenwasser employed legal process, including but not limited to issuing grand jury subpoenas and causing the issuance of search and arrest warrants, with the intent to harm Eman and Martin Soudani for the purpose of earning his bribe payments from Mout'z Soudani. His conduct was without justification and lacked all legitimate authority.

256.    Any semblance of probable cause articulated by the search and arrest warrants employed in this matter, the felony complaints against Eman and Martin Soudani, and the indictment against Martin Soudani, was vitiated by Rosenwasser's receipt of bribe

payments from Mout'z Soudani.

257.    Rosenwasser's corrupt conduct was manifestly and palpably beyond his authority and motivated by his desire to receive money from Mout'z Soudani. Such an improper purpose was plainly outside the legitimate ends of the legal process employed by Rosenwasser.

258.    Hoovler and Borek knew of Rosenwasser's corruption and covered it up, going as far as to require Eman Soudani to agree to what they knew was an illegal requirement that she waive her right to sue them for misconduct.

259.    Hoovler and Borek acted with intent to harm Eman and Martin Soudani and without justification. They knew or should have known of Rosenwasser's corruption and used legal process to cover it up. They did so to protect their own reputations at the expense of Eman and Martin Soudani's constitutional rights. Their actions were designed to, and did, help Rosenwasser conceal the bribes he received from Mout'z Soudani. As a result, their prosecutorial decisions were linked to Rosenwasser's receipt of unauthorized bribes from Mout'z Soudani and the judicial doctrine of prosecutorial immunity provides no defense for the constitutional misconduct committed.

260.    Hoovler and Borek's conduct was guided by their desire to achieve an improper collateral objective: to protect their reputations, that of Rosenwasser, and that of the OCDA at a time when Hoovler was facing intense public scrutiny over other conflicts of interest, including Hoovler's own conflicts in and handling of the Megan McDonald murder investigation.

261.    The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of violations of Eman and Martin Soudani's constitutional, state, and other legal rights, including the right to due process and a loss of liberty, and of damages

including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

262. Plaintiffs are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser because of their wanton, reckless, callous, and willful disregard and indifference to Plaintiffs' constitutional rights.

## COUNT TWO: DENIAL OF DUE PROCESS AND SUPPRESSION OF FAVORABLE EVIDENCE (FIFTH, SIXTH AND FOURTEENTH AMENDMENTS)
42 U.S.C. § 1983
*Against Defendants Rosenwasser, Hoovler, and Borek (in their individual capacities)*

263. Eman and Martin Soudani incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

264. At all relevant times, Eman and Martin Soudani had a clearly established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution (*Brady v. Maryland*, 363 U.S. 83 [1963]; *Giglio v. United States*, 405 U.S. 150 [1973]), to timely disclosure of all information that was favorable to the defense, including exculpatory evidence.

265. Both Eman and Martin Soudani filed timely written notice of their intent to testify before a Grand Jury.

266. Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) knowingly and deliberately chose not to document and/or disclose exculpatory and other favorable evidence to the defense, and (2) Eman and Martin Soudani were prejudiced by the deliberate withholding of evidence. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

267.    Rosenwasser took bribes from Mout'z Soudani. His receipt of bribes was manifestly and palpably beyond his authority.

268.    Rosenwasser willfully did not disclose to Eman and Martin Soudani that Mout'z Soudani bribed him to investigate and to bring charges against them. The evidence was material and exculpatory, and prejudice resulted from the failure to disclose it. The Orange County Court found that Rosenwasser's failures to disclose constituted a *Brady* violation that warranted the vacatur of the judgment and conviction of Martin Soudani.

269.    Hoovler and Borek knew or should have known about Rosenwasser's receipt of bribes and his conflict of interest and chose not to disclose evidence regarding the same to Eman and Martin Soudani. The evidence constituted material exculpatory and impeachment evidence that Hoovler and Borek did not disclose.

270.    Hoovler and Borek possessed extensive evidence of a conflict of interest and a corrupt relationship between Rosenwasser and Mout'z Soudani. As was their practice in this and other matters, Hoovler and Borek did not investigate the red flags, and as a result did not discover and disclose exculpatory evidence. While Rosenwasser's refusal to disclose *Brady* material was predetermined because of the bribery scheme with Mout'z Soudani, Hoovler and Borek refused to undertake their own legal obligations under *Brady* to identify and disclose exculpatory evidence that was already in the possession of the OCDA.

271.    The conduct of Hoovler, Borek, and Rosenwasser fundamentally tainted the integrity of the prosecution, as disclosure of such information would have destroyed both Rosenwasser's and Mout'z Soudani's credibility and required a factfinder, including the Grand Jury, to question Mout'z Soudani's motivation to bring charges against Eman and Martin Soudani.

272. The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of violations of Eman and Martin Soudani's constitutional, state, and other legal rights, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

273. Plaintiffs are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser because of their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' constitutional rights.

## COUNT THREE: MALICIOUS PROSECUTION (FOURTH AND FOURTEENTH AMENDMENTS)
42 U.S.C. § 1983
*Against Defendants Hoovler, Borek and Rosenwasser (in their individual capacities)*

274. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

275. Hoovler, Borek, and Rosenwasser were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 under the authority vested in them by Orange County and New York State.

276. Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) initiated and continued criminal proceedings against Eman and Martin Soudani, (2) did so without probable cause, and (3) were motivated by actual malice. The criminal proceedings initiated by Rosenwasser and continued by Hoovler and Borek (4) terminated in Plaintiffs' favor, and (5) resulted in the violation of Eman and Martin Soudani's rights under the Fourth Amendment. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

277. Rosenwasser intertwined and linked his prosecutorial discretion to

investigate, gather evidence, arrest, detain, and bring charges against Eman and Martin Soudani to an unauthorized demand for a bribe. As a result, the judicial doctrine of prosecutorial immunity provides no defense for the constitutional misconduct committed.

278.     Borek and Hoovler knew about Rosenwasser's corruption. Borek and Hoovler covered up Rosenwasser's misconduct, going as far as to require Eman Soudani to agree to what they knew was an illegal requirement that she waive her right to sue them for misconduct.

279.     Rosenwasser was motivated by actual malice. He was bribed by Mout'z Soudani to humiliate Eman and Martin Soudani and knew that his conduct was without justification.

280.     Hoovler and Borek were motivated by actual malice. They acted for their own benefit, to protect themselves from public embarrassment, and with intent to do harm to Eman and Martin Soudani and without justification. They did so at the expense of Eman and Martin Soudani's constitutional rights. Their actions were designed to, and did, help Rosenwasser conceal the bribes he received. As a result, their prosecutorial decisions were linked to and intertwined with Rosenwasser's receipt of unauthorized bribes, and the judicial doctrine of prosecutorial immunity provides no defense for the constitutional misconduct committed.

281.     Eman Soudani's criminal proceeding terminated in her favor when the charges against her were dismissed by a New York court.

282.     Martin Soudani's criminal proceeding terminated in his favor when the Orange County Court granted the 440.10 Motion, vacated his conviction, and dismissed the indictment on the grounds that the conviction was procured through "extreme prosecutorial misconduct" and fraud on the court.

283.    The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of violations of Eman and Martin Soudani's constitutional, state, and other legal rights, including a deprivation of liberty guaranteed by the Fourth Amendment, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

284.    Plaintiffs are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser because of their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' constitutional rights.

## COUNT FOUR: FALSE ARREST AND FALSE IMPRISONMENT (FOURTH AND FOURTEENTH AMENDMENTS)
42 U.S.C. § 1983
*Against Defendants Hoovler, Borek and Rosenwasser (in their individual capacities)*

285.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

286.    Hoovler, Borek, and Rosenwasser were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 under the authority vested by Orange County and the State of New York.

287.    Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) intentionally confined Eman and Martin Soudani by causing them to be arrested, detained, and imprisoned; (2) without Eman and Martin Soudani's consent; and (3) without justification.

288.    Rosenwasser acted intentionally, with malice and knowing disregard for Eman and Martin Soudani's constitutional rights, in taking actions that intertwined his prosecutorial discretion with his receipt of bribes, and that resulted in their detainment, arrest, and imprisonment against their will.

74

289.    Hoovler and Borek acted with intent to do harm to Eman and Martin Soudani, and without justification. They knew or should have known of Rosenwasser's corruption and covered it up, causing Eman and Martin Soudani to be detained, arrested, and imprisoned against their will. They did so to protect their own reputation at the expense of Eman and Martin Soudani's constitutional rights. Their actions were designed to, and did, help Rosenwasser conceal the bribes he received from Mout'z Soudani. As a result, their prosecutorial decisions were linked to Rosenwasser's receipt of unauthorized bribes from Mout'z Soudani, and the judicial doctrine of prosecutorial immunity provides no defense for the constitutional misconduct committed.

290.    Eman and Martin Soudani were conscious of, and at no point consented to, confinement caused by Hoovler, Borek, Rosenwasser, and Mout'z Soudani's corrupt actions.

291.    As to Eman Soudani, a finding of probable cause that Eman Soudani stole money relied solely on Mout'z Soudani's word. Any probable cause articulated in a resulting search warrant application, felony complaint, or indictment was vitiated by Mout'z Soudani's payment and Rosenwasser's undisclosed receipt of bribes.

292.    As to Martin Soudani, a finding of probable cause that Martin Soudani stole money relied solely on the word of Mout'z Soudani. Any probable cause articulated in a resulting search warrant application, felony complaint, or indictment was vitiated by Mout'z Soudani's payment and Rosenwasser's undisclosed receipt of bribes.

293.    The actions of Defendants Hoovler, Borek, and Rosenwasser were the direct and proximate cause of violations of Plaintiffs' constitutional, state, and other legal rights, including a loss of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

294.    Plaintiffs are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser because of their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' constitutional rights.

## COUNT FIVE: CIVIL CONSPIRACY
42 U.S.C. §§ 1983 and 1985
*Against Defendants Hoovler, Borek and Rosenwasser (in their individual capacities)*

295.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

296.    Hoovler, Borek, and Rosenwasser were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 under the authority vested by Orange County and the State of New York. Each was a high managerial agent within the OCDA.

297.    Hoovler, Borek, Rosenwasser, and Soudani (1) had an agreement to (2) act in concert to inflict unconstitutional injuries upon Eman and Martin Soudani, and (3) each committed an overt act in furtherance of that goal, causing injuries to Eman and Martin Soudani. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

298.    Mout'z Soudani was a private party at all relevant times.

299.    On or around October 2022, Rosenwasser and Mout'z Soudani agreed that Mout'z Soudani would pay Rosenwasser money to take actions designed to deprive Eman and Martin Soudani of their constitutional rights under the Fourth and Fourteenth Amendments. In particular, Rosenwasser agreed to accept payment from Mout'z Soudani to investigate and initiate prosecutions against Eman and Martin Soudani for crimes Mout'z Soudani claimed they committed for the purpose of humiliating and punishing Eman and Martin Soudani.

300.    Hoovler and Borek knew or should have known about the corrupt relationship between Rosenwasser and Mout'z Soudani. Instead of stopping Rosenwasser, Hoovler and Borek joined the corrupt agreement by allowing Rosenwasser to continue the investigation and prosecutions of Eman and Martin Soudani, and then by actively taking over the prosecution themselves. Instead of righting a wrong, Hoovler and Borek doubled down on an injustice to protect themselves.

301.    Rosenwasser took overt acts in furtherance of the agreement, including but not limited to:

    a.  Receiving more than $58,000 in bribes from Mout'z Soudani;

    b.  Perverting the grand jury process and causing fifteen grand jury subpoenas to be issued, which authorized the recipients to bypass the grand jury and submit records directly to EADA Rosenwasser;

    c.  Submitting materially false affidavits for the purpose of causing courts in Colorado and New York to issue search and arrest warrants;

    d.  Providing Mout'z Soudani confidential information;

    e.  Exchanging multiple text messages with Mout'z Soudani that furthered their criminal scheme;

    f.  Traveling to Colorado in order to be present for and to supervise the arrest of Eman and Martin Soudani;

    g.  Agreeing to provide police body cam footage of Eman and Martin Soudani's arrest to Mout'z Soudani so that Mout'z Soudani could see them "humiliated"; and

    h.  Protecting Mout'z Soudani by conferring transactional

immunity on him despite knowing that, days prior to his Grand
Jury testimony, Mout'z Soudani had destroyed incriminating
evidence.

302.    Hoovler and Borek took overt acts in furtherance of the conspiracy,
including but not limited to:

   a.    Turning a deliberate blind eye to evidence of a conflict of
         interest and corrupt relationship between Rosenwasser and
         Hoovler despite a duty to investigate and take action;

   b.    Turning a deliberate blind eye to evidence that Mout'z Soudani
         committed a multitude of crimes so as to protect the viability of
         the criminal cases against Eman and Martin Soudani, and thus
         protect themselves from negative political consequences and
         unfavorable press treatment;

   c.    Failing to disclose evidence to the defense that Rosenwasser had
         a corrupt relationship with Mout'z Soudani.; and

   d.    Conditioning an agreement to dismiss charges against Eman
         Soudani on an illegal agreement not to sue.

303.    Hoovler, Borek, and Rosenwasser's actions were the direct and proximate
cause of violations of Plaintiffs' constitutional, state, and other legal rights, including a loss
of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation,
loss of income, and legal expenses as set forth above.

304.    Plaintiffs are further entitled to an award of punitive damages against
Hoovler, Borek, and Rosenwasser because of their wanton, reckless, callous, and willful
disregard of and indifference to Plaintiffs' constitutional rights.

## COUNT SIX: MUNICIPAL LIABILITY – FINAL DECISIONS BY POLICYMAKER

42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 463 U.S. 658 (1978)
*Against Defendants Orange County, OCDA and Hoovler, Borek and Rosenwasser in their official capacities*

305.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

306.    (1) Hoovler, Borek, and Rosenwasser were final policymakers for Orange County and the OCDA, (2) they made decisions in their official capacity, and (3) there was a direct causal link between these decisions and the deprivation of Eman and Martin Soudani's constitutional rights.

307.    At all relevant times, Hoovler, and his authorized delegates Borek and Rosenwasser, had final authority and were the final policymakers for Defendants Orange County and the OCDA in managing the OCDA, including determining cases for presentation to a grand jury, training, supervising, and disciplining assistant district attorneys, including supervising their use of personal phones for case-related matters, and reviewing conflicts of interest and other ethical issues.

308.    Rosenwasser was responsible for reviewing all potential grand jury cases to determine their appropriateness for presentation to a grand jury. He exercised the authority delegated to him by Hoovler by making decisions to subvert the grand jury process, initiate unjustified and unlawful criminal proceedings against Plaintiffs, and confer immunity on Mout'z Soudani.

309.    Hoovler and Borek were placed on notice of the substantial evidence of a conflict or appearance thereof presented by Rosenwasser's relationship with Mout'z Soudani and made the decision to willfully ignore the glaring red flags of conflict. Hoovler and Borek allowed and promoted Rosenwasser's initiation of and continued involvement

in Plaintiffs' cases.

310.    Rosenwasser also violated the OCDA's policy prohibiting OCDA staff from using their personal phones for case-related texts.

311.    Hoovler and Borek knew that Rosenwasser was violating this policy, and they violated the same policy themselves by not reviewing and disclosing the texts between Rosenwasser and Mout'z Soudani to the defense.

312.    Hoovler's, Borek's, and Rosenwasser's decisions made in their capacities as the final policymaker and/or his delegate directly and proximately resulted in Plaintiffs' deprivation of their constitutional rights and of Plaintiffs' injuries including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

### COUNT SEVEN: MUNICIPAL LIABILITY – INFORMAL CUSTOM
42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 463 U.S. 658 (1978)
*Against Defendants Orange County, OCDA and Hoovler, Borek and Rosenwasser in their official capacities*

313.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

314.    (1) Orange County and the OCDA established patterns, practices, customs, and/or informal policies that constituted a *de facto* policy and custom, as a result of (2) widespread recurring practice that was so permanent and settled that it constitutes formal policy and (3) the adherence to these policies and customs was a direct cause of the violation of the Plaintiffs' constitutional rights.

315.    At all relevant times, Hoovler, Borek, and Rosenwasser, had final authority and was the policymaker for Defendants Orange County and the OCDA in managing the OCDA, including reviewing conflicts of interest and other ethical issues.

316.    Hoovler and his delegates, including Borek and Rosenwasser, maintained

and condoned policies, procedures, customs, and/or practices not to properly investigate allegations of conflict involving assistant district attorneys and/or district attorneys, not to adequately screen assistant district attorneys from cases where there is a conflict of interest or appearance thereof, and to utilize personal phones for case-related texts.

317.    This approach was so consistent and widespread that County officials with policy-making authority tacitly authorized the policies, had actual or constructive knowledge of the widespread custom and unofficial policies, and failed to do anything to end the unconstitutional customs and unofficial policies. Hoovler, Borek, and Rosenwasser's conduct in the Megan McDonald case is an example of an instance in which Hoovler, Borek, and Rosenwasser maintained and condoned these policies, procedures, customs, and/or practices.

318.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officials of Orange County and the OCDA have not taken steps to terminate these policies, practices, and/or customs.

319.    These *de facto* policies, practices, and/or customs resulted in the deprivations of Plaintiffs' rights complained of herein. Hoovler, Borek, and other officials at the OCDA willfully ignored the glaring indications of an impermissible conflict of interest and unethical behavior by Rosenwasser. As a result, Rosenwasser continued to be involved in the criminal cases against Plaintiffs, allowing him to minimize Eman Soudani's allegations of abuse by Mout'z Soudani, confer immunity on Mout'z Soudani, create communications with Mout'z Soudani via his personal phone that were not disclosed in their entirety to the defense, and engage in other unlawful conduct.

320.    Hoovler, Borek, and Rosenwasser's adherence to and promotion of the *de facto* policies, practices, and/or customs herein described directly and proximately resulted

in Plaintiffs' deprivation of their constitutional rights and of Plaintiffs' injuries including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

## COUNT EIGHT: MUNICIPAL LIABILITY – FAILURE TO TRAIN AND/OR SUPERVISE
42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 463 U.S. 658 (1978)
*Against Defendants Orange County, OCDA and Hoovler and Borek in their official capacities*

321.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

322.    Orange County and the OCDA (1) failed to provide adequate training or supervision of municipal employees and (2) demonstrated a deliberate indifference to the deprivation of constitutional rights. Their failure to provide adequate training or supervision (3) resulted in Plaintiffs' constitutional injuries.

323.    Hoovler, as District Attorney of Orange County, and Borek, as Chief ADA, had a managerial duty to provide competent supervision to all subordinate Assistant District Attorneys.

324.    Hoovler, Borek, and other delegates of Hoovler failed to provide such adequate training, and supervision, including but not limited to reporting conflicts of interest and assessing conflicts of interest and requests for recusal, and adhering to the stated policy of not using personal phones for case-related matters.

325.    The recurring pattern of ignoring conflicts of interest involving senior OCDA staff, and of using personal phones for case-related matters with no repercussions, indicated that the need for better supervision and training on the issues was known, obvious, and highly predictable, but Hoovler, Borek and other delegates of Hoovler failed to make meaningful efforts to address this risk of harm to Plaintiffs. The failures showed a

deliberate indifference to the known, obvious, and highly predictable consequences that result when prosecutors are not properly trained, supervised, and/or disciplined.

326.    The failures to train and supervise herein described directly and proximately resulted in Plaintiffs' deprivation of their constitutional rights and of Plaintiffs' injuries including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

## COUNT NINE: ABUSE OF PROCESS UNDER STATE LAW

*Against Defendants Orange County, OCDA and Hoovler as* respondeat superior*, and Defendants Hoovler, Borek, and Rosenwasser*

327.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

328.    By reason of the foregoing, Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) employed regularly issued legal process to compel performance or forbearance of an act (2) with intent to do harm without excuse or justification, (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

329.    The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of Plaintiffs' injuries including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

330.    The actions of Hoovler, Borek, and Rosenwasser alleged herein occurred during the course and scope of their duties and functions as prosecutors, and/or while they were acting as agents and employees of Orange County, the OCDA, and Hoovler (as the

District Attorney) clothed with and/or invoking state power and/or authority, and as a result, Orange County, the OCDA and Hoovler (as the District Attorney) are liable to Eman and Martin Soudani pursuant to the doctrine of *respondeat superior*.

331.    Plaintiffs are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser by reason of either or both (i) their special animus toward Plaintiffs or (ii) their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' rights.

### COUNT TEN: MALICIOUS PROSECUTION UNDER STATE LAW
*Against Defendants Orange County, OCDA and Hoovler as* respondeat superior*, and Defendants Hoovler, Borek, and Rosenwasser*

332.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

333.    By reason of the foregoing, Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) initiated and continued criminal proceedings against Eman and Martin Soudani, (2) did so without probable cause, and (3) were motivated by actual malice. The criminal proceedings initiated and continued by Rosenwasser and continued by Hoovler and Borek (4) terminated in Plaintiffs' favor. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

334.    The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of Eman and Martin Soudani's injuries including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

335.    The actions of Hoovler, Borek, and Rosenwasser alleged herein occurred during the course and scope of their duties and functions as prosecutors, and/or while they were acting as agents and employees of Orange County, the OCDA, and Hoovler (as the

District Attorney), clothed with and/or invoking state power and/or authority, and as a result, Orange County, the OCDA, and Hoovler (as the District Attorney) are liable to Plaintiffs pursuant to the doctrine of *respondeat superior.*

336.    Eman and Martin Soudani are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser, by reason of either or both (i) their special animus toward Plaintiffs or (ii) their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' rights.

### COUNT ELEVEN: FALSE ARREST AND FALSE IMPRISONMENT UNDER STATE LAW
*Against Defendants Orange County, the OCDA and Hoovler as* respondeat superior*, and Defendants Hoovler, Borek, and Rosenwasser*

337.    Eman and Martin Soudani incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

338.    By the foregoing reasons, Hoovler, Borek, and Rosenwasser, individually, collectively, acting in concert and aiding and abetting one another, (1) intentionally confined Eman and Martin Soudani by causing them to be arrested, detained, and imprisoned, (2) without Eman and Martin Soudani's consent, and (3) without justification. The judicial doctrines of absolute prosecutorial immunity or qualified immunity provide no defense for the constitutional misconduct committed.

339.    The actions of Hoovler, Borek, and Rosenwasser were the direct and proximate cause of Eman and Martin Soudani's injuries, including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.

340.    The actions of Hoovler, Borek, and Rosenwasser alleged herein occurred during the course and scope of their duties and functions as prosecutors, and/or while they were acting as agents and employees of Orange County, the OCDA, and Hoovler (as the

District Attorney), clothed with and/or invoking state power and/or authority, and as a result, Orange County, the OCDA, and Hoovler (as the District Attorney) are liable to Plaintiffs pursuant to the doctrine of *respondeat superior.*

341.    Eman and Martin Soudani are further entitled to an award of punitive damages against Hoovler, Borek, and Rosenwasser, by reason of either or both (i) their special animus toward Plaintiffs or (ii) their wanton, reckless, callous, and willful disregard of and indifference to Plaintiffs' rights.

## COUNT TWELVE: NEGLIGENT HIRING, SUPERVISION, AND RETENTION
### *Against Defendants Orange County, the OCDA, Hoovler and Borek*

342.    Eman and Martin Soudani incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

343.    Plaintiffs permissibly plead in the alternative, for purposes of this cause of action, that Rosenwasser's conduct described fell outside the scope of his employment.

344.    Defendants Orange County, the OCDA, Hoovler, and Borek negligently hired, retained, supervised and directed their employee, Rosenwasser, with knowledge of Rosenwasser's propensity for the type of behavior that resulted in Plaintiffs' injuries in this action.

345.    Defendants negligently placed their employee, Rosenwasser, in a position to cause foreseeable harm, which would not have occurred had they taken reasonable care with respect to the hiring, retention, supervision, and direction of employees.

346.    Defendants knew or should have known of their employee Rosenwasser's propensity for the conduct that caused Plaintiffs' injuries.

347.    Defendants negligently failed to train and/or supervise their employee or other employees to identify corruption and conflict of interest involving witnesses.

348.    As a result, Plaintiffs were seriously and permanently injured.

349.    That said occurrence and the resulting injuries to Plaintiffs were caused solely and wholly by reason of the negligence and carelessness of Defendants in their operation, management, maintenance, control, security and supervision of their employees.

350.    As a result of the foregoing, Plaintiffs were injured solely and wholly as a result of negligence, carelessness, and recklessness of the Defendants and/or their agents, servants, and employees, without any negligence on the part of the Plaintiffs contributing thereto.

351.    By reason of the foregoing, Defendants are liable to the Plaintiffs for compensatory damages and for punitive damages, together with interests and costs.

## COUNT THIRTEEN: VIOLATION OF NEW YORK JUDICIARY LAW § 487

*Against Defendants Orange County, OCDA, and Hoovler (as District Attorney) as* respondeat superior*, and Defendant Rosenwasser*

352.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

353.    Rosenwasser, at all times relevant to the Complaint, was an attorney licensed to practice in the State of New York.

354.    Rosenwasser engaged in an extreme pattern of misconduct in his role as an attorney in New York, including lying under oath in proceedings and other matters before New York State courts.

355.    Rosenwasser received over $58,000 in bribe payments from Mout'z Soudani to investigate and prosecute Eman and Martin Soudani.

356.    Rosenwasser caused courts in New York to issue warrants and otherwise to facilitate the OCDA's investigation of prosecution of Eman and Martin Soudani.

357.    Rosenwasser never told New York courts that he took bribes from Mout'z Soudani, the complainant in the criminal matters concerning Eman and Martin Soudani.

358.    Rosenwasser never told Eman or Martin Soudani that he took bribes from Mout'z Soudani.

359.    These extreme and egregious actions evidence an intent to defraud and constituted deceit perpetrated upon New York courts and upon Eman and Martin Soudani.

360.    As a result of Rosenwasser's deceit and misconduct perpetrated upon New York courts, Eman and Martin Soudani suffered material damages and to be determined at trial. Eman and Martin Soudani are entitled to treble damages under N.Y. Jud. Law § 487.

361.    Rosenwasser's conduct occurred during the course and scope of his duties and functions as a prosecutor, and/or while he acted as an agent and employee of Orange County, the OCDA, and Hoovler (as District Attorney), clothed with and/or invoking state power and/or authority, and as a result, Orange County, the OCDA, and Hoovler (as District Attorney) are liable to Plaintiffs pursuant to the doctrine of *respondeat superior*.

## COUNT FOURTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER STATE LAW
*Against Defendants Rosenwasser, Borek, and Hoovler*

362.    Eman and Martin Soudani incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

363.    Hoovler, Borek, and Rosenwasser acted intentionally and/or recklessly by tolerating and covering up outrageous conduct, to wit the bribery of a senior Orange County official and the minimization and disregard of criminal threats made against Eman and Martin Soudani that caused them to fear for their lives. Defendants each (1) engaged in extreme and outrageous conduct against Eman and Martin Soudani beyond all possible bounds of decency, (2) with the intent to cause or with disregard of a substantial possibility

of causing severe emotional distress. Their conduct (3) caused (4) severe emotional distress on Plaintiffs.

364.    Defendants' actions endangered Plaintiffs' physical safety and caused Plaintiffs to fear for their own physical safety.

365.    Defendants' actions and failures to act directly caused Plaintiffs severe emotional distress.

366.    Defendants' conduct caused Plaintiffs to suffer damages, to be determined at trial.

## COUNT FIFTEEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER STATE LAW
### *Against Defendants Hoovler, Borek, and Rosenwasser*

367.    Eman and Martin Soudani incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

368.    Defendants owed a duty to Plaintiffs.

369.    Defendants' actions and lack thereof unreasonably endangered Plaintiffs' physical safety and caused Plaintiffs to fear for their own safety.

370.    Defendants breached their duty of care to Plaintiffs by tolerating and covering up outrageous conduct, to wit, the bribery of a senior Orange County official and criminal threats made against Plaintiffs.

371.    Defendants conduct caused Plaintiffs to suffer damages, to be determined at trial.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable by jury in this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a) The entry of judgment in favor of the Plaintiffs on each and every cause of action;

(b) An award of compensatory damages to them and against the Defendants, jointly and severally, in an amount to be determined at trial;

(c) An award of punitive damages to them and against Defendants Hoovler, Borek, and Rosenwasser, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(d) An award of reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees under 42 U.S.C. § 1988;

(e) An award of pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(f) Such other relief as the Court deems just and proper.

DATED: May 22, 2025
       New York, New York       Respectfully submitted,

                          LEWIS BAACH KAUFMANN
                          MIDDLEMISS PLLC

                          By: */s/ Arthur D. Middlemiss*

                              Arthur D. Middlemiss
                              (arthur.middlemiss@lbkmlaw.com)
                              Marc F. Scholl
                              (marc.scholl@lbkmlaw.com)
                              10 Grand Central
                              155 E. 44th St., 25th Floor
                              New York, NY 10017
                              Telephone: (212) 826-7001
                              Facsimile: (212) 826-7146